## NATIONAL LABOR RELATIONS BOARD v. STOVER.
### No. 2077.

Circuit Court of Appeals, Tenth Circuit.
Sept. 3, 1940.

**514**

Leonard Appel, Atty., National Labor Relations Board, of Washington, D. C. (Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, Richard C. Barrett, and Robert Leland, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

Clarence Baird, of Salt Lake City, Utah, for respondent.

Before PHILLIPS and BRATTON, Circuit Judges, and MURRAH, District Judge.

PHILLIPS, Circuit Judge.

This is a petition to enforce an order of the National Labor Relations Board.[1]

On March 21, 1938, an amended charge was filed against Walter Stover, doing business as the Stover Bedding Company, by Upholsters and Allied Crafts Local No. 501[2] charging that Stover had violated the National Labor Relations Act,[3] 29 U.S.C. A. § 151 et seq., by discharging certain employees because they had engaged in union activities.

On March 23, 1938, the Board filed its complaint against Stover wherein it alleged that he is engaged in assembling, manufacturing, distributing, and selling upholstered furniture, mattresses, comforters, and allied products at Salt Lake City, Utah; that a substantial proportion of the materials used in the manufacture of such products is purchased in and transported from states outside of Utah into Utah, and that a substantial proportion of the products manufactured is sold and transported from Utah to, into, and through other states; that Stover on November 3, 1937, discharged Ralph Barlow, on November 15, 1937, discharged Bonnie Maxwell, and on November 17, 1937, discharged Elmer Barlow, Steven Clements, Marvin Thomas, Oris Gray, Frank Colianna, Henry Clark, and Delbert Taufer, and had refused to reinstate them; that Stover discharged and refused to reinstate such employees because they joined and assisted Local No. 501 and engaged in concerted activities with other of his employees for the purpose of collective bargaining and other mutual aid and protection, and thereby did discriminate in regard to hire and tenure of employment of such persons, discourage membership in Local No. 501, and engage in unfair labor practices within the meaning of § 8, subdivision (3) of the Act; that prior to and during the month of November, 1937, and down to the issuance of the complaint, Stover urged, persuaded, and warned his employees to refrain from participating, by membership or otherwise, in the activities of Local No. 501, and threatened his employees with discharge and other reprisals if they became or remained members of or participated in the activities of Local No. 501, and thereby interfered with, restrained, and coerced his employees in the exercise of the rights guaranteed by § 7 of the Act, and engaged in unfair labor practices within the meaning of § 8, subdivision (1) of the Act.

Stover filed an answer in which he denied the alleged violations of the act. A hearing was had before an examiner who filed his intermediate report. Exceptions thereto were filed by Stover and the matter came on for hearing before the Board. The Board found that Stover, by attending without invitation an initial organizational meeting of employees of his plant and other similar plants located in Salt Lake City, by instructing an employee to attend and spy upon a union meeting of his employees, and by making anti-union statements and threats to his employees, interfered with, restrained, and coerced his employees in the exercise of the rights guaranteed by § 7 of the Act; that Stover discharged Ralph Barlow, Elmer Barlow, and Marvin Thomas because of union activities; and that Stover engaged in no unfair labor practices with respect to the other employees discharged.

The Board entered its order that Stover cease and desist from discouraging membership in Local No. 501, or any other labor organization of his employees,

---

[1] Hereinafter referred to as the Board.

[2] A labor organization chartered by Upholsterers, Furniture, Carpet and Linoleum Layers' International Union of America, a national labor organization affiliated with the American Federation of Labor.

[3] Hereinafter referred to as the Act.

from discriminating in regard to hire or tenure of employees or any term or condition of employment, and from in any manner interfering with, restraining, or coercing his employees in the exercise of the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choice, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection. It further ordered that Stover offer to reinstate Ralph Barlow, Elmer Barlow, and Marvin Thomas and to make each of them whole for his loss of pay during the period of his discharge.

The evidence established that in the early part of September, 1937, the American Federation of Labor began organizational activities among Stover's employees and employees in similar plants in Salt Lake City; that union organizers gave notice of an initial organizational meeting to be held at Labor Temple in Salt Lake City; that one Peterson, an organizer for the American Federation of Labor and president of the Utah State Federation of Labor presided; that Stover attended the meeting without invitation; that Peterson requested Stover to leave the meeting, pointing out the impropriety of an employer attending such a meeting; that Stover replied that he had been a member of a labor organization and favored the American Federation of Labor; that his employees were free to join the union, but that if his low-paid help could not bring him a profit, he would lay off every low-paid man in his plant.

Clements testified that the Monday morning following the meeting above adverted to there was a rumor of strike at the plant and that Stover said, "If my boys go out on strike I will close my doors or blow up my plant"; that on other occasions Stover stated that he would not sign a contract with the union and that he would have nothing to do with the union and threatened to close his shop. Thomas testified that Stover stated in the filling room of the plant that the boys were just wasting their money paying fees to the union. Ralph Barlow testified that Stover stated that he would lay off his low-paid help if they joined the union, and close the upholstery department, and that the boys who were discharged had brought it on themselves. Elmer Barlow testified that Stover instructed Mr. Naylor, an employee in the upholstery department, shortly prior to a second union meeting held the first part of October, 1937, to attend the meeting and see what was going on and who was attending; that Stover further stated the union would never be in his factory; that the unions were not doing the country any good and he did not believe in them and that he would never consent to them operating his plant because he felt he was capable of running things his own way. Paul M. Peterson testified that he was president of the Utah State Federation of Labor and an organizer for the American Federation of Labor; that he presented a contract to Stover at his plant in November, and that Stover stated he would have nothing to do with the union and could lay off enough employees so the union would not have a majority. Junior Fox testified that Stover stated that if his employees joined the union and went out on strike he would shut down his plant because he would not be able to pay the union scale. J. R. Jacobs testified that Stover said he did not think the union should come in and tell him how to run his factory.

There was much evidence from other employees, many of whom were members of the union, that Stover had reiterated on many occasions that he believed in organized labor; that he had no objection to his employees joining a union and that they were free to join if they were so inclined; and that Stover treated his employees with fairness and consideration. But it is not our province to weigh conflicting testimony.[4] We are of the opinion that the finding of the Board that Stover interfered with, restrained, and coerced his employees in the exercise of the rights guaranteed by § 7 of the Act is supported by substantial evidence.[5]

Ralph Barlow joined Local No. 501 early in October, 1937. He regularly attended union meetings and was a member of the Negotiating Committee. Elmer Barlow joined the union about the middle of October, 1937, and attended union meetings.

4 National Labor Relations Board v. Waterman Steamship Corp., 309 U.S. 206, 226, 60 S.Ct. 493, 84 L.Ed. 704; Fansteel Metallurgical Corp. v. National Labor Relations Board, 7 Cir., 98 F.2d 375, 380.

5 See Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126; National Labor Relations Board v. Bradford Dyeing Ass'n, 310 U.S. 318, 60 S. Ct. 918, 84 L.Ed. 1226.

Thomas attended the organizational meeting and joined the union late in September or early in October, 1937. Each of the other employees discharged in November, 1937, was also a member of Local No. 501.

Stover experienced a sharp decline in his business in the fall of 1937, which continued throughout the ensuing winter. During that period his gross sales were as follows:

| 1937 | |
|---|---|
| October | $40,496.82 |
| November | 29,527.51 |
| December | 28,385.44 |
| 1938 | |
| January | 21,306.34 |
| February | 19,636.52 |
| March | 20,836.08 |

Ralph Barlow first went to work for Stover on January 22, 1936. On the third day of his original employment he suffered an accident resulting in a serious injury to one hand. He was re-employed in March, 1937, as a clean-up man in the plant at $10 per week. His pay was later increased to $10.50 per week. He was unable to do heavy work. He loafed on the job and did not put forth his best efforts to do the work he was able to do. Stover employed Elmer Barlow in March, 1937, at $12 per week. His pay was thereafter increased to $18 per week. He was employed in the upholstery department as an unskilled worker. He was dissatisfied with the wages he received and lost interest in his work, loafed on the job and became inefficient, was insubordinate and refused to obey orders. Ralph and Elmer Barlow frequently expressed dissatisfaction with their lot. A foreman had recommended to Stover that he discharge Ralph and Elmer Barlow because of inefficiency. Stover replied he would keep them as long as business was good.

Thomas was employed in July, 1937, as a night watchman. He took the place of a former night watchman who had been in the employ of Stover since 1931, who was put on day duty. When the business decline came, Stover no longer needed the former night watchman for day duty. He discharged Thomas and put the former night watchman on night duty.

In making the discharges in November, 1937, no seniority rights were violated. At the time of the hearing the places made vacant by the discharged employees had not been filled by new employees, except that

Daniel Fiel, a junior high school boy, was employed from six to ten in the evening and assisted the night watchman and did some of the clean-up work that had theretofore been done by Ralph Barlow.

The inefficiency of Ralph and Elmer Barlow was established by the testimony of their fellow employees and is uncontradicted. While they received increases in compensation it is clear that it was due to Stover's sympathy and not because their work justified the increases. We are convinced that the evidence overwhelmingly established that Ralph and Elmer Barlow were discharged because of their inefficiency and the decline in business, and that Thomas was discharged because of the decline in business and in order to restore the place of the old night watchman who was no longer needed on day duty, that these were the sole reasons for the discharges and that the evidence admits of no reasonable inference to the contrary.

The order will be modified by eliminating therefrom subparagraph (a) of paragraph one and subparagraph (a) of paragraph two, and as modified will be enforced.

