350

## NATIONAL LABOR RELATIONS BOARD v. AUTOMOTIVE MAINTENANCE MACHINERY CO.

No. 7349.

Circuit Court of Appeals, Seventh Circuit.

Dec. 12, 1940.

Bernard L. Alpert, of Washington, D. C. (Robert B. Watts, Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, Samuel Edes, and Ernest Cook, all of Washington, D. C., on the brief), for National Labor Relations Board.

David R. Clarke, of Chicago, Ill., for respondent.

Before EVANS and SPARKS, Circuit Judges, and LINDLEY, District Judge.

EVANS, Circuit Judge.

The abbreviations here used are explained in the margin.[1]

Upon petition of the SWOC, the Board issued its complaint, February 21, 1938, wherein respondent was charged with unfair labor practices, in the following respects: (1) Initiating and sponsoring AMMCO and subsequently dominating said organization and then recognizing AMMCO as its employees' sole bargaining representative; (2) refusal to bargain with Amalgamated; (3) the discharge and refusal to reinstate four employees because they were active in Amalgamated; (4) intimidating its employees in the exercise of their right to self-organization.

Respondent denied all unfair labor practices; admitted it had bargained with AMMCO and had done so because the latter was the duly constituted bargaining representative of a large majority of its employees.

A trial followed; AMMCO intervened. The examiner made his report which was unfavorable to respondent. He therein stated the facts testified to by witnesses for CIO and omitted all facts favorable to respondent and supported by the testimony of numerous witnesses. The Board approved the report and ordered respondent to cease and desist (a) dominating AMMCO or contributing financial support thereto; (b) dominating and interfering with its employees in the exercise of their right to self-organize; (c) recognizing AMMCO as the employees' representative for collective bargaining; (d) giving effect to its contract with AMMCO, and directing a withdrawal of all recognition of AMMCO; (e) directing respondent to offer reinstatement to three employees, and to make them whole for any loss suffered by reason of their discharge.

Jurisdiction of the Board is not open to question. The stipulated facts bring the case within the rule governing the Board's jurisdiction, announced in National Labor Relations Board v. Fainblatt, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014.

The well-nigh undisputed evidence shows the following fact situation: Respondent's plant is located close to Fansteel Metallurgical Company's plant—an open field, only, separating them. During the winter and spring of 1937, agitation and lawlessness occurred in the Fansteel plant which culminated in the sit down strike in February. See National Labor Relations Board v. Fansteel Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599; Fansteel Corp. v. National Labor Relations Board, 7 Cir., 98 F.2d 375. The unrest spread to respondent's plant where, up to April, 1937, there was no labor organization of any kind.

The efficiency of the men became lower and production fell off. Instead of working steadily, employees gathered from time to time into small groups to discuss labor conditions generally and the local labor situation in particular.

In April, discussion ran to Amalgamated. Organizers of SWOC contacted some of the employees and a substantial percentage joined. Travis, the respondent's superintendent, made inquiries of the employees and their activities and expressed opposition to the CIO. At least some witnesses so testified. He denied it.

The unrest resulted in a further reduction in production and Wacker, respondent's president, called on Travis to "get production back to its normal efficiency." In an attempt to do so, Travis named an employee, Maguire, a member of the CIO to pass a ballot box around and let the men vote on whether they wanted an inside or outside union. Maguire was told, "It was none of his business, nor of mine, either, how the men voted." Maguire passed the box and a secret ballot was taken. 29 were for an inside union, 14 were for an outside union. Two ballots were blank; one employee was not at his bench.

[1] The Steel Workers Organizing Committee, called the SWOC, a labor organization affiliated with the Congress for Industrial Organization, hereafter called the CIO; the Amalgamated Association of Iron, Steel and Tin Workers of North America, hereinafter called Amalgamated; a labor organization known as AMMCO Workers' Association, hereinafter called AMMCO.

The employees then asked if they could have a meeting at 4 P. M. that afternoon. The request was granted upon authorization of the president.

The employees met; a committee and officers were selected. A counsel was employed and AMMCO was born. Its purpose was to bargain with the management concerning wages, hours of work, and labor conditions. Respondent gave its pledge "that no attempt will be made by the management at any time to influence the action of the AMMCO except through discussion and negotiation with your Committee."

A subsequent meeting was held where a general wage increase was demanded, upon which respondent asked for time, and requested as an alternative proposition, an expression from employees as to whether they wanted a forty or forty-four hour week. They were told the answer to this query should precede consideration of wage.

AMMCO again met and directed its officers to demand a closed shop agreement. The organization moved toward more complete unionization. Meetings were held by the men during the noon hour. Wages and hours and conditions of work were the chief subject of discussion. The bargaining committee met periodically with the management. AMMCO's attorney was engaged in drawing up a closed shop agreement. Respondent expressed an unwillingness to deal with a body which was not incorporated and therefore not "legally responsible." Some weeks later officers of AMMCO learned that a committee from CIO was trying to negotiate with Travis and the employees met in a mass meeting after working hours and again recognized AMMCO as their collective bargaining agent. Its president went to Springfield and secured the incorporation of AMMCO. Again a bargaining committee approached the management for a raise in pay and other matters connected with their employment. This time the request was granted.

On July 1, 1937, AMMCO's first meeting away from the property was held, dues were fixed, and collected, and money was had to pay rent. By-laws were adopted. Application cards were printed and formality was given to the previous organization efforts. Thereafter, AMMCO served as the sole bargaining agent for the employees. On November 15, 1937, employer entered into a written contract recognizing it as the sole bargaining agent. Membership in it was made a condition of employment, and the company agreed to pay the best wages in keeping with the income of the company and sound business judgment. It agreed to pay 1½ wages for overtime, but reserved the right to reduce hours of work, if necessary, but only after consultation with AMMCO's bargaining committee.

A committee for handling of grievances was provided for. AMMCO agreed to refrain from calling a strike until all efforts to arbitrate had failed. The agreement was to remain in force one year, unless AMMCO before that time ceased to represent a majority of the employees or dissolved its corporate existence, in which case the agreement was automatically terminated.

During this time the CIO launched a vigorous membership drive. The record shows five or six, and perhaps more, of the employees joined both organizations, testifying that they did so "in order to be safe no matter which organization won out."

One Mills, the representative of the CIO, and organizer for the SWOC, appointed a committee to see the superintendent and arrange a meeting for him to discuss the status of the CIO with the Company. The hour set was two P. M., Saturday afternoon, May 15th, 1937.

Travis told the committee that the president of the Company was out of the city and he had no authority to speak for the Employer. He called the president, however, who was in Milwaukee, and told him the situation and learned that President Wacker could not get back in time for the meeting. Travis so informed the members of the Committee—Warner, Jordan, and Olson,—so he testified. Olson, one of the discharged employees, and a member of the committee, also said Travis so told them, but the other two employees, also discharged, testified that no one informed them the meeting was off. It was arranged by the three employees and Mills that the latter should be present at two P. M. at this May 15th meeting. Mills called Travis on the phone Saturday morning and was informed that Wacker was out of the city and the meeting was off. Mills replied that he would keep the appointment anyway, unless the committee informed him to the contrary. Of the making of this call, and the substance of this conversation, both Mills and Travis agree.

At two P. M. Mills appeared at the plant. All the doors were shut and locked. Only

a part of the force was at work and they, on overtime. Mills said he talked through one of the locked doors with Travis, who was somewhat excited, gesticulating angrily, and told him to go away. Mills further said, and Travis denied it, that Travis said, "John L. Lewis, (wild-eyed John L. Lewis) and no hill-billy would tell him how to run his plant, that the CIO was out."

Travis then went to the second floor to see if the members of the committee were there and found two, Warner and Jordan were not. Returning promptly to the lower floor, he found the door had been unlocked and Mills was inside.

There is no dispute as to the door's being unlocked, but whether Mills had gotten inside, or was just coming through the door is controverted. Mills says that Travis and the watchman slammed the door on him and pushed him back and prevented him from getting in, after which they again locked the door. Travis testified that Mills was in when he returned and the guard and he forcibly ejected him, and then locked the door.

Thereafter Travis confronted Warner, Jordan and Olson, and learning, as he says, that they had unlocked the door and let Mills in, he discharged them, and they were paid off that day.

Warner and Jordan, on the hearing, denied letting Mills in, although they admitted they went down to meet him. They did not know how the door was unlocked or how he got in. They also said they did not know that the meeting was called off. Olson said he had been told the meeting was postponed, and Mills testified that he was told that the meeting had been called off. Both Jordan and Warner stated that they went to the basement door to meet Mills, pursuant to their agreement with him. They do not deny that the door was locked and that Mills had been ordered away a very few minutes before and that during Travis' absence, the door was unlocked and Mills was either inside or "just getting" inside.

There was conflicting evidence from which the examiner might have found either way as to statements made by Travis derogatory of the CIO. Travis denied these statements and stated that the president informed him that they were to be neutral and the employees should be free to choose as they pleased; that all the management sought was an improvement in production. The examiner ignored or rejected, perhaps both, the testimony of Travis and Wacker. Thirty-one out of the thirty-one witnesses who testified at the hearing before the examiner, expressed their preference for, and their desire to continue in AMMCO. They were, or said they were, opposed to CIO.

One of the basic findings upon which the unfair labor practice finding was predicated, was the discharge and refusal to reinstate Warner and Jordan. The Board found this was because they had joined and assisted the CIO.

We can well believe this was the substance, if not the turning point of the case.

If this finding be sustained there is little left of the case. For under such circumstances there is no question of the seriousness of the employer's violation of its duty to its employees. No more effective form of intimidation, nor one more violative of the N. L. R. Act can be conceived than a discharge of an employee because he joined a union, be that union the CIO or the AMMCO. It is for this reason that the evidence of discharge of these men has been so fully stated and is now so fully considered.

The facts in their more important aspects are hardly in dispute.

Warner and Jordan were discharged on Saturday afternoon because they unlocked the door and let Mills, the CIO organizer into the plant.

Whether Travis was correct in his assumption that Mills would or might attempt to repeat the sit down strike efforts in respondent's plant, that he had undertaken and carried through in the Fansteel plant, may be passed for the moment as unimportant. It is sufficient to observe that the action of Warner and Jordan in admitting Mills, who came uninvited and was told to go away, and who knew he could have no meeting with the absent President Wacker, was an act of gross insubordination, and evidence disloyalty on the part of the two employees, which justified their prompt discharge.

Part of the plant was working overtime, which meant extra wages were being paid to those who were there that Saturday afternoon. Ordinarily the plant was closed Saturday afternoon.

We assume the position is not debatable that if the employer desires to have its plant locked and free from outside disturb-

ances or interferences on Saturday afternoon when extra or special work is in progress, it is at liberty to do so. In fact, it had the right to close the back door and lock it at any time.

The evidence is that Mills approached this back, basement, door, Saturday afternoon, and sought admission; that prior thereto he had been told there would be no meeting with the employer because of the absence of the president from the city; that he had been again told of the impossibility of a meeting, and he had been asked to go away. It is also clear that the employees, Warner and Jordan, had work at their machines; that they were being paid extra for doing such work; that they knew they were not being paid to act on a reception committee to meet the intruder, Mills; that meeting him at the basement back door aroused suspicion of a premeditated plan of entry by Mills, all of which called for explanation by these employees and is wholly inconsistent with loyalty to their employer or their employment.

On any theory or fact assumption, the employees were breaching their duty as employees. As to Mills, he had been told he could not enter and the reasons why. They were reasonable and sufficient. Why then did he insist in the efforts to get in? His presence could have but one effect, disruption of the work going on in the factory. He could not talk CIO unionization because the president, as he knew, was not in the building. We repeat, he may not have been there to start a sit down strike or any strike at all. He may not have presented himself when the few employees who favored his union were there and insisted on getting in for an unworthy purpose. Nevertheless his persistence in attempting to force himself into the factory cannot be ignored when we consider the two employees' action toward him. No explanation consistent with duty to the employment for which they were paid can be found for their action. Their place was at their machines. They knew the president of employer was not in. Mills' entry could not have been to further CIO unionization work *legitimately*. They also knew that unionization work. during working hours was inconsistent with the full performance of their duties for which they were paid, unless, of course, the employer was willing

that they take time off at its expense. They found the door locked. Mills was outside. The door was the back basement door. It was physically impossible that the door, which was locked on the inside, should unlock itself. The testimony conclusively negatives the theory that the superintendent or any other employee, save W and J, unlocked the door to let Mills in. With such clarity as to say a contrary finding is unsupported by substantial evidence, the conclusion is reached that W and J unlocked the door. There is, it is true, a contradiction in the evidence. But we cannot escape this conclusion, notwithstanding the weight we must give the examiner's finding. There are other facts which can be reconciled only on the correctness of the foregoing conclusion.

The superintendent, after evicting Mills, was indignant and confronted W and J and demanded an explanation. He says they admitted their misdeeds, asked if they were to be discharged, and were told they were discharged. Their statement is that they left their work to go to the basement to meet Mills; they do not say they unlocked the door[2]; that they made no admissions to the superintendent. They agree with him in one matter. They were then and there discharged, and as soon as possible that afternoon they were paid off.

It was not, however, necessary that the employer justify the discharge of W and J. For an employer is within its right in discharging an employee whom it believes is not doing his work faithfully or well. The discharge may be with or without good reason, excuse or justification, National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Martel Mills Corp. v. National Labor Relations Board, 4 Cir., 114 F.2d 624, 633, provided the discharge was not because of the employees' union activities.

"The mere existence of union affiliations, though these affiliations be material in nature, does not leave the employee free from the consequences of his indiscretions and failings. Where economic considerations necessitate a contraction in the employer's labor force, the employer, in deciding which employees are to be retained, must be free to choose from the more capable and the more worthy. It would be an abuse of the

---

[2] Warner admitted that he had his hand on the door knob to open it and let Mills in. Jordan testified that it might have been Warner who tried to open the door to let Mills in.

terminology of the Act if an employer were obliged to discriminate in favor of union men as against non-union men through fear of action by the Board and the courts. Cf. Jefferson Electric Co. v. National Labor Relations Board, 7 Cir., 102 F.2d 949, 957; Appalachian Electric Power Co. v. National Labor Relations Board, supra, 4 Cir., 93 F.2d [985] at page 989." Martel Mills Corp. v. National Labor Relations Board, supra. Our inquiry here must be directed solely to the ascertainment of the existence of substantial evidence to support a finding that the discharge was because of W's and J's union activity.

The Board contends that the discharge was because of such activities. ·

This issue involves a conclusion, though generally speaking it is a factual finding. On the theory that its conclusion is a factual one and therefore not assailable by any court, petitioner denies our right to investigate this issue or disturb its finding.

■ Our conclusion is that our duty to make inquiry to ascertain if any evidence exists which supports the fact conclusion is clear and that where facts negative a certain deduction, the fact conclusion must fall for want of supporting proof.

■ The discharge was made because during working hours, the employees went to a locked door in the basement to let a Union organizer into the factory, well knowing such organizer could not negotiate with the president who was away. Can it be said that a discharge which followed was due to union activities? Reasons for discharge are discussed only because the existence of the. one advanced by employer negatives the union activity reason.

A few illustrations will serve to show that notwithstanding union activities may have actuated employees, they could not be said to be the proximate cause of, nor the inducement for, the discharge.

Had W and J left their work that afternoon and gone to the president's office and visited with Mills, whom they admitted to the factory in defiance of the superintendent, and there remained for the rest of the day, dismissing the president's secretary, and for so doing they were discharged, could it be said that, though interested in the union, they were discharged because of their union activities? Or assume the employees left their work without notice and were gone a week. They testified that they were interested in union labor and spent the week as observers of the struggle between the police and the picket line in the sit down strike in the nearby Fansteel factory. The employer discharged them because of their long and unexcused absence from work. They testified that their absence arose from their interest in the union activities. Can it be said that the discharge was due to their union activities? More, would a court be barred from reviewing a finding (a conclusion) that the employees' union activities were the cause of their discharge?

The Board found the discharge of these two men was one of the unfair labor practices indulged in by respondent. It is possible that without this unfair practice the order might never have been entered. We cannot say.

As to the employee Olson, the examiner found he was not discharged for union membership or activity. It is not easy to distinguish the activities of the three men. As Olson's discharge is not before us, however, we need not consider it.

The Board also found the respondent coerced its employees in their right to self organize. As bearing upon this issue, respondent sought to show that the employees, even at the time of the hearing, all stated they were uncoerced members of AMMCO. In other words, their action in joining AMMCO was not under duress or coercion.

The positions taken by opposing counsel in this aspect of the case are irreconcilable. The Board refused to print the parts of the record which tended to support respondent's contention. Respondent printed it as an additional appendix on the theory that it was important, if not controlling.

Some thirty-one employees testified at the hearing. Thirty-one of them stated that they were members of AMMCO and wished AMMCO to represent them. Inferentially, and sometimes directly, they said that they did not want CIO to be their bargaining agent. Four of these thirty-one, were at one time members of CIO, but had withdrawn.

The theory of the Board seemingly is that the contest is not one wherein the employees are interested. It is a contest between the employer and the CIO and the employees are merely the causi belli.

■ An opposing theory is builded upon the premises that the N. L. R. Act, 29 U. S.C.A. § 151 et seq., was enacted for the

benefit of the employees and to improve the relationship between the employer and the employee. As we tried to point out in the case of Foote Bros. Gear, etc., Corp. v. National Labor Relations Board, 7 Cir., 114 F.2d 611, the Act was passed to protect the employees, to give them the free and unrestricted right to organize, to bargain collectively, and to freely select the agent to represent them in collective bargaining. The Board's selection of a bargaining agent is quite as violative of the spirit of the Act as the employer's domination of the employees when they are making *their* choice.

The question over which dispute has so sharply arisen, does not meet the precise question. Our question is to determine, not the conclusiveness of such evidence, but whether it is relevant and bears at all either on the Board's findings or its order.

We are persuaded that such evidence should be received on both questions. It may be true that an employer's permission to employees to occupy the factory work place for union gatherings is an unfair labor practice—that failure to dock employees' wages for fifteen minutes of company's time, which the employees used in meeting and appointing committees looking to the organization of a union, is also unfair labor practice on the part of the employer. Conceding, as we must, because it has been so held that such is ipso facto unfair labor practice, we believe the order of the Board should be, and, in view of the purpose of the Act, must be, made in the light of the freely and frankly expressed wish of the majority of the employees as to union preference. It is inconceivable that a different conclusion may be rationally reached, save on the theory that the contest is one between employer and the rejected union; that the wishes of the employees, though uninfluenced by the too-zealous efforts of both employer and unsuccessful union, count for naught. In other words, the Board, by eliminating the local union and limiting the candidate for employees' choice to one, in fact and in truth selects the union for the employees. This theory, so contrary to the expressed purpose of the Act, we must reject, until and unless the Supreme Court holds otherwise.

Nearly all the employees took the witness stand. Thirty-one out of thirty-one favored AMMCO. We do not go so far as to hold they could not be influenced. We merely hold their expressed wishes under oath where full and free cross-examination was possible, may not be, as here, wholly ignored. Because of its so doing, we are convinced that the order of the Board should not be enforced.

The petition is denied.