## NATIONAL LABOR RELATIONS BOARD v. UNION MFG. CO.

### No. 10009.

Circuit Court of Appeals, Fifth Circuit.

Dec. 16, 1941.

Robert B. Watts, Gen. Counsel, Laurence A. Knapp, Associate Gen. Counsel, and Bernard R. Bralove, Atty., National Labor Relations Board, all of Washington, D. C., for petitioner.

John Wesley Weekes and Murphey Candler, Jr., both of Decatur, Ga., for respondent.

Before FOSTER, HOLMES, and McCORD, Circuit Judges.

HOLMES, Circuit Judge.

In a proceeding conducted pursuant to Section 10 of the National Labor Relations Act, 29 U.S.C.A. § 160, the Board found that respondent discharged and refused to reinstate Frank Barker because of his union activities, and because he gave testimony against the company in a proceeding under the Act, thereby violating Section 8 (1), (3), and (4) of the Act, 29 U.S.C.A. § 158 (1, 3, 4). Upon these findings it ordered respondent to cease and desist from such unfair labor practices, to offer Barker reinstatement with back pay, and to post appropriate notices.

The sole question for our decision is whether or not the Board's findings are supported by substantial evidence. If so, the order is proper and should be enforced; if based upon mere suspicion, the order is invalid and unenforceable.

Barker was discharged by respondent on March 29, 1940, after having worked for it for twelve years. During the last several years of his employment he had been the leader in organizational activities at respondent's plant. He joined the Union Textile Workers of America in 1934, and participated in a three-weeks strike. The following year he was elected to a minor office in the union. He was an active leader during the period from 1937 to 1940, presiding over meetings and conferring with representatives of the company. At one of these meetings he referred to Lamb, the president of the company, as a gambler, and said he did not want a gambler to handle his money, even though he had joined the Presbyterian Church and had quit gambling.

On March 21 and 22, 1940, Barker testified at a hearing before a trial examiner of the Board in a proceeding in which respondent was charged with violating Section 8 (1) and (5) of the Act by refusing to bargain with the union; one week later Barker assisted in distributing leaflets announcing a union meeting. The leaflets were distributed at the gate in front of the plant office. The next day Barker was discharged. The reason assigned by the company for his discharge was inefficiency and insubordination. The Board held that the discriminatory character of the discharge was revealed by its background and the unpersuasive explanations offered by respondent. It excused the employee for

calling one of his superior officers a liar and the other a gambler on the ground that he was representing the union and entitled to the dignity of equal standing.

Such an attitude on the part of an employee toward an employer (or of an employer to an employee) should not be countenanced, regardless of any rank or standing; but, if we overlook Barker's calling the superintendent a liar and the president a gambler, we still have the uncontradicted and unimpeached testimony of Barker's inefficiency and insubordination. One act of insubordination is admitted by Barker himself. It was when he was told to leave Mr. Lamb's office. Barker refused to leave.

Barker also used vile language in the presence of his foreman, and failed to heed a warning not to repeat it. An incident of profane language was related by foreman Chapman in the following testimony:

"A. One time I got after him about his work, bad work,—I had been down to stop some machines that were running bad; and I told him I wanted them fixed, so he said, 'Yes, God damn it, you put fellows over there to help other fixers and you don't give me any help.' And, I don't know—he said, 'God damn it' two or three times, and went on to say something about a petition. I told him that I knew nothing about the petition and he asked me if I wasn't engineering it through, and I told him that I wasn't. And he asked me if I didn't ask some of the knitters about it over there, and I told him that I did, and I wanted to see it, and I would like to sign it myself. And he says, 'What would you do if I tore one of the God damned things up right in front of your eyes?' and I told him that I wouldn't do anything because it was nothing to me. And I says, 'Are you proceeding to cuss me out?' and he says, 'No, I am not cussing you.' And I says, 'Then let's not have so much cussing,—we can do without that.'

"Q. Was that done in the mill? A. Yes, sir.

"Q. At a time when he was on the job? A. When he was on the job."

Barker does not deny the acts of insubordination that were assigned as the direct cause of his discharge, and the positive evidence of such insubordination is not disputed by any other witness.

Turning to the matter of inefficiency, Barker was one of about thirty fixers who worked for respondent, and was the most inefficient of them all. The record that was kept prior to his discharge shows that Barker's machines, over a period of fifty-one weeks, have been stopped 1,176 times because of defective work; that the next highest number of machines stopped was 899; that the third highest was 756. The record also shows sizing tests of the fixers, and that Barker's record was worse than any of the others. Over a period of several months his record for bad sizing was 85, and the next highest employee among a group of thirteen was only 15, and the third highest employee was 12. These records had been kept by the superintendent for months, and the final additions on the bad work were made just prior to the hearing before the Board.

The testimony further shows that Barker was a hard man to keep at his work, and that for three or four years the foreman had complained to the superintendent about Barker's bad work. He would leave his work and attend to other matters. A great portion of what the witnesses say on this subject is undisputed.

We think the record discloses beyond contradiction that Barker was not discharged for union activities or because he testified, but because of his inefficiency, his insubordination, and his insolent attitude toward his employers. It is unnecessary for an employer to justify the discharge of an employee so long as it is not for union activities. The presumption is that the employer has not violated the law, and the burden of proof is not upon the employer, but upon the one who asserts the fact, to prove that the discharge was because of union activities. This burden has not been met, and the Board's findings are not supported by substantial evidence. The petition to enforce the order should be denied. Consolidated Edison Company of New York v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S. Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Appalachian Electric Power Company v. National Labor Relations Board, 4 Cir., 93 F.2d 985; National Labor Relations Board v. Thompson Products, Inc., 6 Cir., 97 F.2d 13; National Labor Relations Board v. Bell Oil & Gas Company, 5 Cir., 98 F.2d 405; Ballston-Stillwater Knitting Company, Inc. v. National Labor Relations Board, 2 Cir., 98 F.2d 758; National Labor Relations

Board v. Union Pacific Stages, Inc., 9 Cir., 99 F.2d 153; Jefferson Electric Company v. National Labor Relations Board et al., 7 Cir., 102 F.2d 949; Cupples Co. v. National Labor Relations Board, 8 Cir., 106 F.2d 100; National Labor Relations Board v. Walter Stover, etc., 10 Cir., 114 F.2d 513; Martel Mills Corp. v. National Labor Relations Board, 4 Cir., 114 F.2d 624, 633; National Labor Relations Board v. Automotive Maintenance Machinery Company, 7 Cir., 116 F.2d 350; National Labor Relations Board v. West Texas Utilities Company, 5 Cir., 119 F.2d 683.

Petition denied.