**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MIAMI COCA–COLA BOTTLING COMPANY, Respondent.**

**No. 15290.**

United States Court of Appeals Fifth Circuit.

May 13, 1955.

342

James A. Ryan, Atty., Owsley Vose, Associate Chief Enforcement Bureau, David P. Findling, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Fannie M. Boyls, Atty., National Labor Relations Board, Washington, D. C., for petitioner.

Theo Hamilton, Hamilton & Bowden, Jacksonville, Fla., for respondent.

Before HUTCHESON, Chief Judge, HOLMES, Circuit Judge, and DAWKINS, District Judge.

DAWKINS, District Judge.

The Board seeks enforcement of its order requiring respondent to reinstate one employee, to reimburse another for time lost as a result of a layoff, to cease and desist from interfering with, restraining and coercing employees and to post notices. The Board found that respondent: (1) violated section 8(a) (3) of the Act, 29 U.S.C.A. § 158(a) (3), by discharging Phyllis Wingate because of her organizational activities; (2) also violated that section by laying off Lester Anderson for one week because of his union activities; and (3) violated section 8(a) (1) when one of its supervisory employees, J. B. Monk, assaulted two union officials who were distributing literature outside the plant.

The union[1] began its campaign to organize respondent's employees in late October or early November, 1952. About the 8th of November respondent's president received a letter from the union giving notice of its activities. On November 17th Wingate was discharged, and on the following two days some employees struck and picketed the plant in protest over her discharge. On November 29th Anderson was laid off for one week on a charge of loafing. On March 3rd, 1953, during working hours, Monk came out of respondent's plant and assaulted union representatives on the street while they were distributing literature. Charges were filed by the union, resulting in the order heretofore mentioned.

1. District Lodge No. 40, International Association of Machinists, AFL.

### I. The Discharge of Wingate.

This employee was the receptionist and switchboard operator for respondent and had been so employed for about a year when organizational activities began. She joined the union about November 1st and became active in its campaign, soliciting memberships from plant employees and drivers. According to her testimony she carried a union button about the size of a half dollar, which she said was placed on her desk "some time" on Friday, November 14th. She stated the button remained on her desk, in open view, through the remainder of Friday and on Saturday morning (her testimony on this point was corroborated by two drivers who were members of the union and who said they saw the button on her desk). On the following Monday she was discharged and told there had been complaints from customers about the way she had talked on the telephone.

Respondent produced the testimony of several fellow workers and of Mrs. Buckner, its president, to the effect that Wingate had habitually used vulgar and profane language in the office and on the telephone; that she often was insubordinate and criticized her superiors and fellow employees; that customers had made complaints about her vulgarity and discourtesy while talking to them on the phone; that she had been repeatedly advised, implored and warned to refrain from such speech and conduct. Mrs. Buckner testified that she had become disgusted with Wingate and had on several occasions requested supervisors to correct the situation; that she finally became convinced Wingate would not improve and instructed supervisor Stevens to discharge her, which he did.

Wingate admitted on cross-examination that she used some of the language attributed to her; and when questioned about specific occasions later testified to by respondent's witnesses, she would not deny the offensive language and conduct, but stated either that she didn't remember or that the incidents "may have" occurred.

The trial examiner discredited respondent's explanation for Wingate's discharge, finding it a "mass of contradictory, inconsistent, and confusing testimony," and determined that Wingate was discharged because of her union activities. The Board held: "It is not unreasonable to conclude that such behavior became suddenly insufferable just a few days after the Union filed its representation petition, when the decision to discharge her summarily was made. We find on the basis of the evidence and the Trial Examiner's credibility findings that there is no substance to the alleged explanation for Wingate's discharge, and that she was discharged for union activities."

■ On this record, in the face of uncontradicted testimony by respondent's witnesses and Wingate's admissions, it cannot be questioned that she regularly used offensive and often profane language and for some time had conducted herself in a manner objectionable to fellow workers and supervisory personnel. We are therefore constrained to doubt that the issues presented could properly be resolved on the basis of credibility, for the Board could not have found that Wingate was completely innocent. The conclusion, then, must have been that *despite Wingate's conduct,* she was discharged because of her union activities. However permissible that inference might otherwise be, it was necessarily based upon a finding that respondent's management knew or could be presumed to have known that Wingate was a union member and active in the campaign. We think there is no substantial evidence upon which such a finding could be based.

Mrs. Buckner and other witnesses testified positively that they did not know Wingate was active in the campaign; in fact, Mrs. Buckner stated that the letter received from the union led her to believe the organizational efforts were directed only toward plant employees and drivers and that she did not know any office employees were involved. Wingate did not testify that she had directly discussed her union activities with or in the

presence of any management personnel. The Board apparently relied heavily upon the presence of the union button on her desk two days before her discharge; but all management witnesses denied seeing it, and Wingate testified only that one supervisor passed her desk and another talked with her near the desk. To conclude from such evidence that respondent discharged Wingate because of her union activities requires the pyramiding of inferences which has been so often rejected by the Courts. N.L.R.B. v. National Paper Co., 5 Cir., 216 F.2d 859; N.L.R.B. v. Armour & Co., 5 Cir., 213 F. 2d 625; Tampa Times Co. v. N.L.R.B., 5 Cir., 193 F.2d 582. Enforcement of the order with respect to Wingate must be denied.

## II. The Layoff of Anderson.

This employee had worked for respondent for about ten years as a stacker of coca-cola cases, being also in charge of rotating the stock and keeping the stockroom in order. In October, 1952, respondent began installation of new machinery and equipment to effect the modernization of its system of stacking cases, and Anderson was assigned to do various odd jobs, such as painting, cleaning up, etc. He had become active in the union's campaign and was on the picket line during the strike resulting from Wingate's discharge. He testified that a few days later he talked with Mrs. Buckner about a job in the refrigeration department, telling her he thought he had proved himself worthy of promotion, but he quoted her as saying: "Yes, you proved yourself the other day down there on the street. You took the business out of my hands. Now I am not allowed to say anything. To hell with you, Lester. Get out of here. I don't want to talk with you no way." He also stated Mrs. Buckner told him he could expect cold treatment thereafter.

He testified that a few days later, on November 29, while returning to his duties from the water cooler in the yard, he was stopped and accused of loafing by Monk. An argument ensued and he said

Monk told him he should be fired. He stated that about twenty minutes later he was summoned to the office of the general superintendent, Pinter, and laid off for a week on the charge of loafing. He swore that he denied the charge and challenged Pinter to produce witnesses who could substantiate it, but that Pinter refused to do so.

When he returned to work after the layoff, Anderson was assigned to a new job in the renovated stacking department, and on the following day complained of an injury to his back. He was sent to a doctor and has not worked for respondent since that time. Some time later he received a letter from respondent to the effect that it could not hold his job open and was therefore discharging him.

Monk testified that Anderson had not performed his duties satisfactorily after his old job as stacker had been abolished and that he had been warned on several occasions that he should be more attentive to his duties and get more work done. He said that he had warned Anderson twice on the day of his layoff before the incident in the yard. In describing that incident, he said that he again warned Anderson, who made the statement: "Why don't you fire me?" Monk testified that he reported the situation to Pinter, who then laid Anderson off.

Watkins, Pinter's assistant, testified that Anderson had always been a good employee and that he had never known of him to loaf before his old job was abolished. However, he stated that Anderson had been loafing on the day he was laid off. Pinter did not testify, and the trial examiner gave weight to that fact, stating in his intermediate report that respondent had given no satisfactory explanation for its failure to produce Pinter as a witness. Both Monk and Watkins admitted they knew Anderson was active in the union's campaign.

The trial examiner, on the basis of credibility, found that Anderson's layoff was the result of his union activities; that he was assigned the arduous task which caused his injury as punishment for those activities; that he was also

discharged for the same reason while completely disabled. The Board disagreed with the trial examiner as to Anderson's assignment to the new job and as to his discharge, but held that his week's layoff resulted from his union activities, relying upon the trial examiner's credibility findings.

The only evidence in support of the Board's conclusion is the testimony of Anderson himself and the admissions by respondent's witnesses that he was formerly a good employee and that they knew he was active in the union campaign. Contrary to the inference drawn by the Board from such evidence is the fact that had respondent desired to rid itself of Anderson because of his union activities it could have done so with impunity when his old job was abolished. Further, there is the testimony of two witnesses to the effect that he never applied himself to his new duties, resented not being given a job in the refrigeration department and was actually guilty of loafing on several occasions, particularly on the day he was laid off. Their testimony is corroborated by evidence from a Board witness who stated that when Anderson was in charge of the stacking room, it was customary for the drivers to pay "the boys on the platform" 50¢ for loading each truck, which lends credence to respondent's theory that Anderson resented the loss of this supplementary income. Further support for this explanation and corroborative of the charge of diffidence and loafing is Anderson's statement that his own doctor testified before the Florida Industrial Commission that there was nothing physically wrong with him as a result of his accident and that he was suffering from a neurosis. Anderson's account of his discussions with Monk, Pinter and Mrs. Buckner also tends to indicate resentment and dissatisfaction over his new duties.

■ All such evidence cannot be casually eliminated by the simple expedient of "discrediting" respondent's witnesses. We cannot escape the conclusion that the trial examiner, in uniformly crediting the General Counsel's evidence and discrediting all of respondent's, whether or not the latter was contradicted or corroborated,[2] exhibited that degree of bias which deprives his credibility findings of the weight usually accorded them. N.L.R.B. v. National Paper Co., supra; Local No. 3, United Packinghouse Workers of America, C. I. O. v. N.L.R.B., 8 Cir., 210 F.2d 325.

■■ It must always be remembered that the burden of proving discriminatory acts by the employer is and remains upon the General Counsel, and that the employer need not justify action against an employee so long as it did not result from union activities. Tampa Times Co. v. N.L.R.B., supra; N.L.R.B. v. Union Manufacturing Co., 5 Cir., 124 F.2d 332. Absent the credibility findings of the trial examiner, which we must reject for the reasons stated, we think the Board's conclusion that this burden was borne by the General Counsel is not supported by substantial evidence on the record viewed as a whole. Accordingly, we must deny enforcement of that portion of the order relating to Anderson.

### III. The Assault by Monk.

It is not disputed that Monk physically assaulted the two union representatives two days after the Board had ordered an election. It is also agreed that he was a supervisory employee whose position was denominated "assistant superintendent"; but respondent's uncontradicted evidence shows that he actually was the lowest such employee and Anderson called him a "straw boss".

In concluding that respondent was responsible for Monk's act and thereby interfered with, restrained and coerced the employees in violation of the Act, neither the trial examiner nor the Board made specific findings of fact. There is no evidence even to imply that respondent's

---

2. It may also be noted that a reading of the record reflects a similar degree of one-sided uniformity in the examiner's rulings upon the propriety of questions and upon objections to the admissibility of evidence.

management knew in advance the assault would occur or in any way authorized or condoned it. There is positive testimony of Mrs. Buckner and others that such conduct was not allowed; that Mrs. Buckner severely reprimanded Monk immediately and laid him off for a week without pay; that a notice to all employees was immediately posted, informing them that Monk's act was without authority and on his own volition in violation of specific instructions and that diciplinary action was being taken. In the notice the employees were advised that any statements by Monk about union activities were not the policy of the company, and they were requested to disregard any such remarks.

The Board rejected as being without merit respondent's contention that there was no direct evidence the assault was authorized, and held: "The principle is well established in Board decisions that employers are generally responsible for assaults committed by their supervisory personnel in the course of their employment and within the apparent scope of their authority. Moreover, whatever the measures, including disciplinary action, taken by the Respondent to protect itself against future liability for supervisory acts of this kind, such measures could have no effect on the liability which had already been attached to the Respondent."

In its brief the Board relies upon Monk's known animosity toward the union and upon statements attributed by its witnesses to Mrs. Buckner to the effect that she would prefer to close the plant rather than deal with a union. It argues that this anti-union animus, further evidenced by the allegedly discriminatory discharge and layoff of Wingate and Anderson, furnishes ample support for its attributing Monk's act to respondent. However, our disposition of the issues previously discussed eliminates them from consideration and leaves the question of whether or not the act alone can support the Board's conclusion.

We agree that there need not be evidence of direct authorization of the specific act, nor does proof of such subsequent repudiation by the employer necessarily relieve him of responsibility. Rather, as this Court said in Birmingham Post Co. v. N.L.R.B., 140 F.2d 638, 640: "* * * the controlling consideration in a case of this kind is not moral culpability of the employer, nor is it one of conventional representation of the master by the employee. *It is whether employees have been subjected to prohibited compulsions flowing from the employer's economic power which the employer could and should have prevented the use of.*" (Emphasis supplied.) There is no evidence here of strife; and in spite of the statements attributed to Mrs. Buckner concerning her attitude toward organization, there is nothing in the record to indicate any efforts on the part of respondent's management to inhibit the campaign prior to Monk's act. The testimony concerning the altercation indicated that it was a spontaneous affair arising out of a personal argument between Monk and the union representatives. In view of the fact that Monk was immediately disciplined and the notice previously summarized was posted, we are unable to find substantial evidence of the prohibited compulsion. While some employees might be quick to interpret Monk's act as a company-engendered effort to discourage their organization, we think such a belief would be unreasonable under the circumstances revealed by this record. We recognize the principles involved in the cases relied upon by the Board in its brief,[3] but because of the substantially different factual situations there presented their results are not controlling here.

Enforcement denied.

3. International Association of Machinists, Tool and Die Makers Lodge No. 35 v. N. L.R.B., 311 U.S. 72, 61 S.Ct. 83, 85 L. Ed. 50; N.L.R.B. v. American Thread Co., 5 Cir., 204 F.2d 169; N.L.R.B. v. Dorsey Trailers, Inc., 5 Cir., 179 F.2d 589; Birmingham Post Co. v. N.L.R.B., supra.