TRAILMOBILE DIVISION, PULLMAN INCORPORATED, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 24142.

United States Court of Appeals Fifth Circuit.

Feb. 8, 1968.

Charles M. Lanier, New Orleans, La., Hulse Hays, Jr., John R. Phillips, Cincinnati, Ohio, for petitioner; Taft, Stettinius & Hollister, Cincinnati, Ohio, Charles M. Lanier, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., of counsel.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B. Richard Adelman, Atty., N.L.R.B., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Elliott Moore, Atty., N.L.R.B., Washington, D. C., for respondent.

Before WISDOM, BELL and AINSWORTH, Circuit Judges.

GRIFFIN B. BELL, Circuit Judge:

This case comes to us on the petition of Trailmobile to review and set aside an order issued against it by the National Labor Relations Board.[1] In a cross-petition the Board seeks enforcement of the order. The case involves several alleged § 8(a)(1) violations, 29 U.S.C.A. § 158(a)(1), said to have arisen from threats to and coercive interrogation of employees, and through promises of benefits to employees if they rejected the union. The case also involves an alleged § 8(a)(3) and (1) violation based on the discharge of employee Powers. 29 U. S.C.A. § 158(a)(3) and (1). The § 8(a) (1) activities in question arose in the context of organizational activity at Trailmobile's plant in a three day period prior to a union election. The discharge took place some five months later. We conclude that the § 8(a)(1) portion of the order will be enforced. It is supported by a part of what the Board concluded. The order, as it relates to the employee discharge, does not stand muster and will not be enforced to that extent.

The opinion of the Trial Examiner was adopted by the Board. The Examiner combined evidence as to employer interrogation, threats of economic loss, and promises of economic gain with background events occurring outside the six months' period of limitation, 29 U.S.C.A. § 160(b), and concluded that the § 8(a) (1) violations were established by a "fair preponderance of the substantial credible evidence * * *"

We have reviewed the background events to which the Examiner alluded and find that they had only slight if any bearing on the proscribed activities which are charged. In large measure the background considerations involved the employer stating its opposition to unionization as it had a right to do under § 8(c) of the Act. 29 U.S.C.A. § 158(c). See Southwire Co. v. NLRB, 5 Cir., 1967, 383 F.2d 235; NLRB v. Southwire Company, 5 Cir., 1965, 352 F.2d 346. Section 8(c) expressly provides that this shall not constitute evidence of an unfair labor practice.

There was some miniscule interrogation of employees in the pre-six months' period concerning the union campaign but it did not rise to the level of being coercive. NLRB v. Ambox, Incorporated, 5 Cir., 1966, 357 F.2d 138. The evidence that a union campaign was under way and that after the election the company refused to bargain was admissible but these facts add little if anything to the proof of the charges in issue.[2]

This brings us to the specific § 8(a)(1) charges and the evidence supporting them. The burden was on general counsel to show as charged that Trailmobile interfered with, restrained or coerced its employees in the exercise

---

1. Trailmobile Division, Pullman, Inc., and United Aerospace and Agricultural Implement Workers (UAW), International Union, AFL-CIO, 160 NLRB No. 105.

2. This court recently held that Respondent was within its rights in refusing to bargain. Trailmobile Division, Pullman Incorporated v. NLRB, 5 Cir., 1967, 379 F.2d 419.

of some right protected by § 7 of the Act. 29 U.S.C.A. § 157. The § 7 rights involved are those of the employees to self-organization and to join or assist a labor organization. American Shipbuilding Company v. NLRB, 1965, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855; Pratt & Whitney Aircraft Division of United Aircraft Corporation Florida Research and Development Center v. NLRB, 5 Cir., 1962, 310 F.2d 676; NLRB v. Harbison-Fischer Manufacturing Co., 5 Cir., 1962, 304 F.2d 738.

■ We find only two incidents which rise to the level of § 8(a) (1) violations under the standard which we must follow of finding support for them from the record considered as a whole. The union election took place on September 3, 1964. On September 2, plant superintendent Whitehurst asked employee Blevins to state his complaint against the company. Blevins replied that he wanted job security and more benefits. Whitehurst then stated that the employees probably could get insurance, retirement and a ten or twelve cent raise without the union. We hold that the Trial Examiner could conclude that this was a promise of benefits made in the context of a union campaign for the purpose of interfering with the § 7 rights of the workers.

■ The other incident stems from a statement made by foreman Whiteside to employee Hagler on the day of the election wherein, after several preliminary statements regarding the undesirability of unions, he added that a nearby company had fired all of its employees because they tried to get the union in. This evidence is one of the bases for the conclusion of the Examiner that Trailmobile threatened its employees with economic harm to the extent of interfering with, restraining and coercing them in the exercise of their § 7 rights. Considering the circumstances indicated, and despite the fact that very little anti-union activity is disclosed by the record in light of the size of the plant and the number of employees involved, we cannot hold that this conclusion is unsupported.

The § 8(a)(1) portion of the order is due to be enforced.

■ With respect to the discharge of Powers, the conclusion of the Examiner is not supported by the record considered as a whole. Section 8(a)(3) prohibits discrimination in regard to hire or tenure of employment or any term or condition of employment to discourage union membership. There must be both discrimination and a resulting discouragement of union membership. A violation of this section normally turns on the employer's motivation. Oftentimes a discharge tends to discourage union membership even when the discharge is not for that purpose but in the interest of shop disclipine. See American Ship Building Co. v. NLRB, supra, 380 U.S. 300 at p. 311, 85 S.Ct. 955. The court there states that a wide range of employer action has been left unscathed under § 8(a)(3) where the action is taken to serve legitimate business interests in some significant fashion even though the act committed may tend to discourage union membership. The court points out that such a construction of § 8(a)(3) is essential if due protection is to be accorded the employer's right to manage his enterprise.

In NLRB v. I. V. Sutphin, Co.-Atlanta, Inc., 5 Cir., 1967, 373 F.2d 890, 893, we stated:

"* * * The burden is upon the General Counsel to prove and not on the employer to disprove that the purpose of the discharge was to interfere with rights accruing to Adams under §§ 8(a)(3) and (1) of the Act. The Act does not insulate an employee from discharge for engaging in conduct disruptive of harmonious employee relations. Indeed, an employer may discharge for cause or no cause at all. It is only when antiunionism is the motive for the discharge that the Act is violated. * * * The burden of proof is carried only when substantial evidence pointing toward the unlawful motive appears from the record taken as a whole. N.L.R.B. v. Brown, 1965,

380 U.S. 278, 291, 85 S.Ct. 980, 13 L.Ed.2d 839, 849; * * *."

■ Having these rules in mind we turn to the record. We hold that the company knew of the union activity which Powers had engaged in. The Examiner rather overstated the case in saying that he was a leader or that he "kept the flame of unionization alive" but it does appear that he was an active union adherent. On election day he wore twelve union buttons. On one occasion he requested a lead man to join the union. He attended union meetings and distributed literature. It must be remembered, however, that union membership is not a license or a roving commission to do as one pleases in a shop. Employees must comply with normal and usual shop procedures and discipline. On the other hand, employers may not use shop procedures and discipline as a pretext to rid themselves of union activists.

■ Mr. Powers' record together with the facts surrounding his discharge make it clear that the Board decision with respect to his discharge is erroneous. Mr. Powers was an excellent welder but his record for complying with shop discipline was not good. His activities were such that he had received at least three written reprimands prior to his discharge on February 21, 1965. The first written reprimand was on August 2, 1963 for cutting the leads to electric fans and then welding them in a manner which might have resulted in an electrocution.[3] This action apparently was taken because of a dispute which Powers and two colleagues were having with employees on another shift over use of the fans.

On March 5, 1964, because an employee sustained an eye injury from a rivet thrown by a fellow employee, Trailmobile issued a written memorandum to all employees calling attention to the company rule against horseplay. This memorandum noted that an act of horseplay could result in disciplinary action even to the extent of discharge. On September 10, 1964, Powers was given a written reprimand after his continued violations of the rule requiring employees to wear safety glasses. Again, while assigned to another department, he broke off the drill bits of a fellow employee with a hammer or bucking bar, cut off the power supply to this employee's tools, welded clamps used by the same employee to the side of a trailer, and engaged in other activity calculated to aggravate this particular employee. He termed this activity a joke. This fellow employee, five feet three inches in height, became so upset that he requested transfer to another department. Powers denied most of this conduct but a written memorandum was placed in his file on October 8, 1964 regarding it. The memorandum was entitled "Discipline" and was characterized by his foreman at the hearing as a disciplinary reprimand but the Examiner found that it was not a reprimand because it was not shown to Powers. This memorandum provided:

"On 10-7-64 I talked to Mr. Powers concerning his horseplay in the department. I told him that this was strickly [sic] forbidden and that he must stop such unsafe practices. He was specifically told to stop tormenting a fellow worker, George Garrison."

During late 1964 and early 1965 Powers had other troubles. He was warned against throwing milk cartons filled with water in the air so as to spray other workers. He was told that "he was going to have cut out his foolishness and go to work" after a foreman saw him on one occasion poking a fellow employee with a stick while the employee was working from a ladder and on another blowing smoke at a fellow employee through an airhose. There is other evidence of record of Powers' propensity for horseplay and violation of plant rules. Again he pulled a stool from underneath another welder causing him to fall against a hot rail. His excuse was that he had used the stool in the past and the Trial Exam-

---

**3.** The Examiner found that Powers had been in no trouble prior to joining the union in June 1964.

iner found that he had the right to take the stool. On January 12, 1965 Powers threw a rope over the side of a trailer at another welder, striking him on the head and knocking off his welding hood. The employee complained and another written reprimand was issued to Powers. It was addressed to Powers, signed by Supervisor Higginbotham, and provided as follows:

"On 1-12-65 I saw Mr. Powers through [*sic*] an armful of rope at a fellow employee who was working at his station. Mr. Powers had been verbally warned in the passed [*sic*] by Mr. Rogers, Foreman, Mounting Department, of such horseplay. Mr. Powers is being instructed to discountinue [*sic*] such practices in the future. As stated in our Company Safety Rules on page 7; Horseplay will not be tolerated, Fighting, wrestling, throwing anything or 'fooling' of any kind is strictly forbidden. In the future if Mr. Powers engages in horseplay he will be subject to more severe discipline even to of the extent of automatic discharge."

This past record of Powers was excused by the Examiner as being a part of "the spirit of frivolity and good fun" which appeared to be the rule at the plant. There is no warrant in the record for such a conclusion. This brings us to the discharge which took place on February 12, 1965.

On February 11, Powers and Edd Taylor had completed the outside welding on a P model container which was mounted in a manual turnover jig. Powers was a substitute welder in the department for that day only. The container was thirty feet long, eight feet wide and eight feet high. It was necessary to turn the container one hundred eighty degrees in the manual jig for the purpose of additional welding but it was against company work practices to turn it with employees and equipment on the inside. Powers and Taylor turned it with three employees inside who were there for the purpose of grinding and cleaning the interior. These employees had power tools, a wire brush, three airhoses and two electrical lines inside the container with them. One of the employees inside the container reported what had happened to a foreman with the request that something be done about the conduct of Powers and Taylor. An investigation ensued during that day and the next. Powers was discharged and Taylor was given a reprimand.

The difference in the punishment does not demonstrate antiunion motivation since Taylor had been involved in only one prior incident of misconduct (the fan welding incident in 1963) as compared to Powers' long record. There is no proof whatever to show antiunion motivation on the part of Trailmobile other than the fact that Powers was known to be a union supporter. Some 125 men wore union bottons on election day. As stated, Powers wore twelve buttons but this in no way deprived his employer of the right to enforce shop discipline. The substantial evidence from the record considered as a whole only supports a finding that Powers was discharged for his breach of shop discipline. It does not support the finding that his discharge was discriminatory as being in violation of § 8(a)(3) and (1) of the Act. The Examiner fell into error by determining that the shop efficiency was improved by the container turning practice adopted by Powers. Shop methods or practices are, of course, management prerogatives. His other error was in finding no horseplay in the incident but the discharge was for breach of a shop practice.

On last item is the contention of Trailmobile that the order is overbroad with respect to future violations. Cf. the *Southwire Company* cases, supra. This suggestion comes too late. It does not appear that a specific exception was filed to the breadth of the order. NLRB v. Lone Star Textile, Inc., 5 Cir., 1967, 386 F.2d 535.

The petition of the company to review and set aside the order as it respects the Powers discharge is granted and that portion of the order which relates to Powers will not be enforced. Trailmobile's

petition is denied in all other respects. The petition of the Board to enforce is granted except to those portions of the order which relate to discharging employee Powers.

On Trailmobile's petition to review and set aside, granted in part and denied in part; on the Board's petition to enforce, granted in part and denied in part.