TRAILMOBILE DIVISION, PULLMAN INCORPORATED, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 25470.

United States Court of Appeals Fifth Circuit.

Feb. 20, 1969.

 

Charles M. Lanier, New Orleans, La., Hulse Hays, Jr., Alan E. Harazin, Cincinnati, Ohio, for petitioner, Taft, Stettinius & Hollister, Cincinnati, Ohio, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., of counsel.

Marcel Mallet-Prevost, Asst. Gen. Counsel, John D. Burgoyne, Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, N. L. R. B., Washington, D. C., for appellee.

Before GEWIN and BELL, Circuit Judges, and BOOTLE, District Judge.

BOOTLE, District Judge:

This case is before the court on the petition of Trailmobile to review and set aside an order of the National Labor Relations Board and on the cross-petition of the Board to enforce the order. The Board's decision and order are reported at 168 NLRB No. 31. The petition to review and set aside will be granted in part and denied in part; the petition to enforce will be granted in part and denied in part.

The labor relations difficulties being experienced at the Longview, Texas plant of petitioner have been considered by this court in two recent opinions. See Trailmobile Division, Pullman Incorporated v. NLRB, 379 F.2d 419 (5th Cir. 1967), (order to bargain set aside); Trailmobile Division, Pullman Incorporated v. NLRB, 389 F.2d 195 (5th Cir. 1968), (order involving § 8(a) (1) violations enforced; order involving § 8(a) (3) and (1) violation denied enforcement).

This most recent chapter in the continuing struggle between Trailmobile and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), AFL-CIO, involves an economic strike and the failure to reinstate employees to their former positions either in whole or in part. It also involves an order finding coercive interrogation of one employee and the improper disciplining of another.

██ The record supports the finding of coercive interrogation in violation of § 8(a) (1) of the Act with respect to employee Hill and the order is due to be enforced as it respects this activity. 29 U.S.C.A. § 158(a) (1); NLRB v. Harbison-Fischer Manufacturing Company, 304 F.2d 738 (5th Cir. 1962).

■ Another § 8(a) (1) violation rests on the disciplining of union secretary Green for attempting to present employee grievances to the company. Green was elected secretary of the union in 1965. Between January and July of 1966 he attempted on three separate occasions to present grievances on behalf of other employees to management. One grievance centered around Green's contention that welders were not being promoted from within the plant ranks; on another occasion he complained of written reprimands being given to two fellow employees; and another involved the seniority rights of an employee. The third occasion, involving the welders, resulting in the plant superintendent issuing a written warning to Green to the effect that Green was involving himself in matters with which he was not personally concerned. The warning provided that no further harassment of management representatives would be tolerated even if it was necessary to discharge Green.

We have held in at least two cases that the presentation of grievances of the type in question is protected by § 7 of the Act. 29 U.S.C.A. § 157. NLRB v. Laney & Duke Storage Warehouse Co., Inc., 369 F.2d 859, 866 (5th Cir. 1966); NLRB v. Bowman Transportation, Inc., 314 F.2d 497, 498 (5th Cir. 1963). Trailmobile failed to call these cases to our attention; rather it chooses to rely on NLRB v. I. Posner, Inc., 342 F.2d 826 (2d Cir. 1965), where the court pointed out that § 8(a) (5) was restricted to the presentation of grievances by bargaining representatives enjoying majority support. The union there did not enjoy majority status. The employer refused to talk with a group of employees while a union representative was present. This was held not to violate § 8(a) (1). That decision is clearly inapposite for here the attempted presentation of the grievances and the warning occurred during the time when Green was occupying his official status as secretary of the union and during the time when the union was enjoy-

ing certification as the bargaining representative. It is true that Trailmobile had refused to bargain and was pursuing its remedy of review and that this court eventually set aside the order. This, however, was much later, in fact on June 21, 1967. We conclude that our prior decisions are controlling; that presentation of the grievances under the circumstances was within the protective ambit of § 7 of the Act. The Board did not err in holding that § 8(a) (1) of the Act was violated by the threat against Green.

■ The Board found § 8(a) (3) and (1) violations in the refusal to reinstate two employees, Hammock and Hill, to their old jobs following the termination of the economic strike. They were given other and less desirable positions. The record supports this holding of the Board. Trailmobile failed to show "legitimate and substantial business justifications" for its refusal to reinstate them to their former positions. NLRB v. Fleetwood Trailers Co., 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614, 617 (1967); NLRB v. Great Dane Trailers, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1968).

This leaves for decision the postponed reinstatement of employee Green from January 21, 1966, after the termination of the economic strike on January 20th, until his full reinstatement on January 27, 1966, and the permanent discharges of employees Felts, Gray, and Colley. These four employees were officials of the union: Green, Secretary; Gray, Vice President; Felts and Colley, both trustees, and all four, members of the negotiating committee. On Friday night, November 26, 1965, after spending a substantial portion of the day at the picket booth, these four men engaged in pugilistic and terroristic activities involving three non-union employees, Travis Higginbotham, Gerald Cox, and D. G. Clark, who were continuing to work during the strike, these activities beginning at the Horseshoe Lounge, a Longview night spot, at about 8:30 p. m. and ending on the highway in

an adjoining county in front of the home of one of the non-striking employees, D. G. Clark, between 11 and 12 o'clock that night. It will be necessary to outline as briefly as possible some of the evening's activities and in doing so let us note carefully the accounts given by the union men themselves since the examiner chose to accept the testimony of Green, Felts, and Colley, rejecting that of Higginbotham and Clark.

Pausing first at the Pig Trail Inn where they had a beer or two the four striking employees arrived at the Horse Shoe Lounge shortly after 8 p. m. where some of them had another beer. About 8:30 the three non-striking employees, having paused first at the Mardi Gras and having had some beer also, arrived at the Horse Shoe Lounge not knowing of the presence there of the first four men. Felts, Colley, and Green were seated in a booth (Gray was dancing or playing a juke box or both) when Clark, Higginbotham, and Cox walked in through the rear door. The Lounge was dimly lighted and Colley recognized the late arrivals before the latter could see those already present. What happened then is covered by the Examiner's findings as follows:

"the three non-strikers entered the room and paused briefly, looking for a table, then moved toward the bar; as they paused, Colley, who was facing them, said to his companions: 'Here come some of our friends'; Cox walked past the booth but Higginbotham said something to the effect that he did not know they permitted 'union men' in the place; Felts answered that they had as much right to be there 'as you scabby sons-of-bitches.' At this Higginbotham turned to face Felts and said: 'You don't mean that; stand up and say it,' whereupon Felts stood up and repeated his statement. Higginbotham then punched Felts in the mouth, breaking his two front teeth, and Felts grabbed Higginbotham around the neck with one arm and punched him in the body several times. At this point the proprietor

arrived and pushed the two of them out the front door. Green, Colley, Clark and Cox followed them out."

Colley gives a little fuller account. through the first blow as follows:

"A. I told Bobby and Ira Felts that some of our friends just came in. 'Rooster' Clark came on past the table and Travis Higginbotham came past the table and looked back to us and said something to the effect, or the way I understood it "Do they allow these Union guys in here?'

"Ira Felts replied to him, 'We have as much right in here as you sons of bitches.' Travis proceeded walking on but he stopped and turned around. He asked Felts did he mean that and Felts said, 'Yes, I do.' Travis said, 'If you mean that, stand up and say it.'

"Ira Felts repeated it again; 'We have as much right in here as you sons of bitches.' About that time Travis hit Felts in the mouth. I believe at that time I had stood up also. I started over to where they were, about three or four steps away, and Clark 'Rooster' Clark was on the opposite side of Travis and Felts from where I was.

"The manager was coming over that way and told us to get out. I told the manager we hadn't done anything, that they started it, that this guy had hit my friend in the mouth."

\* \* \* \* \* \*

"A. Travis hit Felts in the mouth. I heard Felts ask Travis if that was the best he could do and he got Travis around the neck. They started toward the front door and it was Travis, Felts, and Clark and there was a big crowd ganging up around them."

For what happened in the parking lot let us look first to the testimony of the four striking employees. Green says that upon the manager's interference Felts turned Higginbotham loose and Higginbotham went out the door and Felts went right behind him. After Green got out the door he saw that Clark, a non-striker, had grabbed Felts

by the arm and was begging Felts not to hit Higginbotham, but Felts slung Clark off his arm and Clark fell down beside a car and Felts went on toward the direction that Higginbotham had gone. Cox, a non-striker, said something to Felts as Felts went by (Felts says: "I thought he had cussed me") and Felts grabbed Cox and bent him back over a car and was fixing to hit him, but Cox went to begging "please don't hit me" and he didn't hit him. Then Felts saw Higginbotham over by some more cars and started for him. Green got in front of Felts and tried to stop him, urging him to go to the car before they all got into trouble, and Higginbotham was saying "Thank you Bobby [Green]." Then Green asked Felts if he was ready to go and Higginbotham said "Turn the so and so loose, I can take him." Green then released Felts and Felts and Higginbotham fought some more, Felts knocking Higginbotham down a couple of times.

Felts pretty well corroborates Green as to their conduct in the parking lot, agreeing that Clark grabbed Felts by the arm and begged him not to hit Higginbotham any more and not to start any trouble, to which Felts replied, "I didn't start it; he hit me first and broke my teeth, but I'm going to finish it," and slung Clark off his arm. Felts' account continues:

"Now, where Cox came from, I don't know, but as I was going down to where Higginbotham—

"(By Mr. Dodson):

"Q. Let me interrupt you. When you say 'Cox', who—

"A. Gerald Cox. He is an inspector in the plant.

"Q. All right. Go ahead.

"A. As I proceeded to go after Higginbotham, or follow after Higginbotham, Gerald Cox said something. I thought he had cussed me and I wheeled and grabbed Gerald Cox and pushed him against the fender of a car, or the hood of a car and I drawed

back to hit him and he begged me not to hit him, that he didn't cuss me.

"At that time I heard Higginbotham using abusive language, I understood, to Bobby Green and at that time I thought in my mind that he was going to fight Bobby Green, so I proceeded over there and Bobby Green stepped in front of me and said, 'No Felts, it's over with.' He said 'I want you to go to my car; it's all over with.'

"Higginbotham told Bobby says, 'Let the son of a bitch go; I can take him.' So Bobby Green said, 'all right,' and stepped out of the way, I hit Higginbotham and knocked him down and he got up and I knocked him back down."

Colley's account includes the following:

"A. I went by [the juke box] and punched A. B. and said, 'They went outside,' and I went on out. I don't know how far behind A. B. was, but I beat him outside. When I got outside, there was Ira Felts, Bobby Green, Gerald Cox, 'Rooster' Clark and Travis Higginbotham all about 60 feet away from the door. That would be back in this direction.

"I saw Felts with Cox up against a car. What they said I don't know. Bobby and Travis were over between the front of two more cars. Clark was sort of out in front of the furtherest car. When I came up to where they were, I saw there was trouble. I asked Cox did he have anything to say and he said 'No.' Bobby, Ira Felts and Travis and Clark were all talking. What they said I don't know.

"I went over to where they were and asked Clark where his car was and caught a hold of his arm and pulled him away from the rest of them. He said, 'It's down here, but wait a minute,' and he said 'No, let's go get my car and get out of here before we all get into trouble.'

"About that time, A. B. Gray came up. He apparently thought that 'Rooster' and I were fighting. He

come around to where 'Rooster' was and caught him by the shoulder and asked him where his car was and he said, 'It's down here, but I am not going.' He started kicking back at A. B. and A. B. was trying to get him to go to his car and when he started kicking at A. B., I hit him, either in the eye or on the nose, I don't know. He went down to the ground. A. B. and myself both helped him up. He asked A. B. not to let me hit him any more. I told him that I wouldn't hit him any more and get on out of here and stay out of trouble."

The remaining striker witness is A. B. Gray who says that when he finished playing the selection he had on the juke box and went out he saw the six who had preceded him and continues:

"It looked like a little trouble might be developing between Colley and 'Rooster' Clark, so I went down there and I attempted to get between them by spreading my arms like this (indicating). I did have the back of my hand against 'Rooster' pushing him back and about this time Colley hit him and he knocked him down and he landed in a berry patch out there, or something on the side of this road that goes down to the—well, in fact, it goes all the way around the Horse Shoe Lounge. It goes down to the parking lot behind the Horse Shoe Lounge.

"So I picked him up. Colley may have helped me, and started him down the hill and asked him where his car was and he said, 'Down yonder,' and I said, 'Well, let's go and get in it.' I kept a hold of his arm until we got down the hill and I said, 'Where is your car?' and he said, 'Right yonder,' indicating the car. It was close to the back stairs of the Horse Shoe Lounge and I said, 'Well, go get in it.' So he went over there and got in it."

Clark's testimony largely corroborates, and is largely corroborated by, the testimony of Green, Felts, Colley and Gray. Clark had been a member of the union and went out on strike with the others, but on September 17, 1965, on the ninth day of the strike, he wrote a letter to the Union, saying: "I request my name & card be stricken from the U.A.W. Records. I do not want the U.A.W. or any of its affiliates to act as my bargaining Agent at the Longview Trailmobile Plant." He varies to some extent the Lounge colloquy between Felts and Higginbotham by quoting Felts as saying to Higginbotham: "You son of a bitch, you are the one that I want" or "You scabby son of a bitch, I want you." Then Clark continues:

"I tried to break it up, I told him, them, I said, 'Well, we didn't know you all was here.' I said, 'If we did, we wouldn't have stopped.' I said, 'We will go on.' He said, 'No, before you all go on, we will have it out,' or something like that.

"And Travis and Felts had already started a brawl and the floor bouncer—I was making so much noise and static that he grabbed me and carried me out, pushed me out the door. I told him, I said, 'We just got here.' I said, 'We haven't had time to sit down.'"

\*    \*    \*    \*    \*    \*

"Well, I went out past the cars and I don't know how long I stayed there, maybe a minute, maybe three minutes. I started back in the place and that's when A. B. Gray grabbed me when I started back into the door. So I been knowing A. B. for a long time, so A. B. grabbed me by the shirt collar and he pushed me out the front and he drawed back to hit me and I begged him not to hit me.

"I didn't want to start no brawl or nothing like that. That's when I got struck. All I remembered is him hitting me and I am getting up and someone else hit me, but I can't say who hit me, but I do remember seeing Colley and Green standing there. And I said to Green, I said, 'Green, as long as you have been knowing me and you are going to let them beat me up?' and he

said, 'You had a chance to change sides of the fence.'

"I know one time I was getting up—maybe more than once, I don't know how many times—but the first lick—it was a pretty hard one that I got—someone kicked me in the side and I taken it to be Colley—

"Trial Examiner:

"Said take what?

"The Witness:

"Struck me in the side with a shoe.

"(Continuing)

"A. So after that, I was kind of messed up pretty bad. A. B. got me by my shoulder and Green and asked me where my car was at. I told them it was around the back and they carried me down and put me in the car and told me to stay there."

\* \* \* \* \* \*

"Well, I went out the front door and went between two or three cars, two cars, I guess, or four cars, I went out there. Well, I stood there about a couple of minutes, or more, I don't know how long I stood there. I started back in there. I might have stayed there longer than that, but I don't know just about how long.

"I started back to the door, well, when I started back in, that's when A. B. Gray caught me, when I started back in. He was coming out.

"Q. Now, just how did he catch you when he started out?

"A. Well, when I opened the door to go back in, A. B. was coming out.

"Q. Did you see Felts, Colley and Higginbotham, Cox or anybody else leave after you left?

"A. No, sir, I didn't see nobody come out when I went to the door except A. B. Gray. That's the only one that I seen because I was backing up—

"Q. O. K. Where did he grab you again?

"A. He grabbed me by the shirt.

"Q. By the front of your shirt?

"A. Yes, sir.

"Q. O. K., what did he do with you then?

"A. He backed me out against the cars and then I was begging him all that time not to hit me—he was drawed back to hit me—and I begged him all the time not to hit me.

"Q. How long was it that he had his hand drawed back to hit you?

"A. Well, I don't know how long it was.

"Q. A minute?

"A. I couldn't say. I couldn't say how long it was. He backed me out there between those cars—I couldn't say.

"Q. All right.

"Go ahead.

"A. Then he struck me.

"Q. Where did the blow land?

"A. Well, the first blow, I suppose, must have been right up here between my eyes because my teeth got busted later.

"Q. O. K., then what happened?

"A. Well, I remember when I was getting up, I was struck again and maybe the second blow—that's when my teeth was busted, and that's when I really went to begging them not to bust my false teeth.

"Q. You didn't see who struck the second blow?

"A. No, sir I couldn't say that A. B. did or not, I couldn't say.

"Q. Up until that time, the only one that you had seen outside was A. B. Gray?

"A. No, sir, in the meantime, right about the second blow or maybe somewhere there, Bobby was there.

"Q. Before the second blow, up until the second blow, the only one that you had seen outside was A. B. Gray?

"A. Well—

"Q. Yes or no?

"A. Well, let's put it this way: The only one that I seen when I got the first blow was A. B. Gray and maybe the second blow, or I seen Colley and Green.

"Q. Did you see anything of Higginbotham?

"A. No, sir.

"Q. Cox?

"A. No, sir.

"Q. Felts?

"A. No, sir.

"Q. O. K.

"What happened after you were hit the second time?

"A. Well, I was—the third time my teeth was busted and somebody, Colley bumped me into the side with his foot.

"Q. Somebody * * *

"A. Bumped me with their foot in my side while I was laying down.

"Q. You don't know who that was?

"A. It was Colley. After that—I was begging—and A. B. Gray picked me up and Bobby Green—

"Q. Picked you up? How did they pick you up?

"A. Well, they got me by the arms. One got on one side and one got on the other one—

"Q. Don't go so fast. He has got to take this down.

"A. Well, I guess I was getting up and they helped me. One got on one side of me and one the other.

"Q. Who was this; Gray and Colley?

"A. No, Gray and Bobby Green.

"Q. O. K.

"A. They escorted me to my car.

"Q. Did they put you in the car?

"A. Yes, sir.

"Q. Did they open the door for you?

"A. Yes, sir.

"Q. Did they say anything to you when they put you in?

"A. I believe so. I believe one of them told me to stay there. I believe that's what they said.

"Q. Were you hurt pretty bad by the time they put you in the car?

"A. Yes, sir, my mouth was cut and the blood was running all over everything."

Coming now to the departure from the parking lot we see that Colley attempted to prolong the violence even when Clark and Higginbotham attempted to escape in Higginbotham's car. Colley admitted that he shoved Higginbotham from behind and threatened him, and after Higginbotham was inside the car, Colley continued to reach for the door handle. Colley testified: "The car started rolling backwards and I reached for Clark again." [1]

Higginbotham drove Clark to the Mardi Gras where Clark got in his car

---

1. Colley's testimony on this point is:

"A. B. and myself started on down toward the car and got almost to the car and I turned around and went back to where Felts and Travis and Bobby and Cox were at.

"When I got back up there, there was no one there but Travis between the two cars. He was trying to get into one of them and I asked him was that his car and he looked up and down the side of it and said, 'No, it is not.' I said, 'Clark is in your car down here behind us. Let's get in it and get out of here.'

"We started back around to where his car was and I told him to hurry up and I gave him a little shove. He stopped and turned around and said that he didn't run for no damn body.

I stopped, backed up a little bit and told him, 'When I get through with you, you will be glad to run,' and he drew his arm back—whether he intended to hit me, I don't know. A. B. Gray came up and met us and asked him to get in his car and let's go. He went on to his car with A. B. and I followed them. When he got in his car, Bobby was coming down from the other end of the building, down toward the back. Bobby went up to the car window where Travis was sitting down in his car and he started thanking Bobby for something. I don't know, I could hear him say, 'Thank you, Bobby.'

"Q. This is Bobby Green?

"A. Bobby Green.

"He said something—what it was I don't know—and called my name.

and drove home. Higginbotham drove on to his home. Cox had earlier caught a ride away from the parking lot.

The four striking employees continued to drive around. First they drove about four miles East on Highway 80 to the home of a fellow Union officer and told him of the Horse Shoe Lounge incident. They did not stay there long as he had a visitor. Then they went back West a block or so to a liquor store where Felts bought and consumed at one time a half-pint of whiskey and the others bought a six pack of beer. And then, to let Colley tell it:

"I told the group with me: A. B., Felts and Bobby that I had to go to a rest room, to stop at a service station. And someone said, 'No, let's go out here in the country and we will all go to the rest room.' So we turned off of 80 and drove—I don't know how far—and someone said, 'Turn right here and we will go off up this road. There's not very many houses here.'

"We were going along this road and Bobby says, 'This is where Mr. Young lives.' He also said 'Rooster' [Clark] lives on this road too."

Clark's home is over in adjacent Harrison County about five miles from the home of the Union officer they had visited and about eight to nine miles from the Horse Shoe Lounge. They stopped their car near a culvert and clump of bushes in front of Clark's house, ostensibly to relieve themselves. Clark, alarmed by his dog's barking, turned on his porch light and saw the car. Then, to let Clark tell it:

"They didn't stay—not very long and Felts was outside the car and so I backed around back in my garage, put my car back in the garage and Felts got back in and there was another car coming over the hill and he said, 'You scabby son of a bitch, we will be back tomorrow night.' "

Felts has never denied making that threat, though Green and Gray say that at this time no words were "exchanged" between his group and Clark, and Colley says that at this time no words were "passed" between anyone in his group and Clark. On cross-examination Gray testified that on this occasion Felts said nothing to Clark but admitted that in his unemployment compensation hearing before the Texas Employment Commission on March 30, 1966 he had testified that he did not know whether Felts had said anything to Clark on this occasion.[2]

"Q. Who are you referring to?
"A. Travis Higginbotham said something and called my name and Bobby said, 'Now, let's don't get smart.' I reached for the door handle and told him if he wants to get us in trouble let him get out and we'll all get in trouble together.

"Q. Now, let me interrupt you right there. Mr. Colley, you said you told 'him', who did you make that statement to?

"A. I told Bobby this.

"Bobby pushed me back and I started back for the door handle and A. B. Gray come in between me and the car and put both arms on top of the car on each side of the door and held me back. Well, I could hear 'Rooster' Clark—he was sitting in the passenger side of the car—say something. I went around to his side of the car and asked him, 'What did you say?' He said, 'Nothing.'

"I said, 'You people know what you are trying to do?' 'We are not trying to do anything,' 'Rooster' said. I said, 'No, you are trying to get us in trouble.'

"The car started rolling backwards and I reached for Clark again, but I stepped back and they left. Bobby, A. B., and myself went to my car. Felts was leaning up on the fender. I unlocked the car and we all got in and left the Horse Shoe and came back in this direction."

2. The Commission found that while there was not sufficient evidence before it to warrant a finding that Gray was guilty of physically assaulting any of the nonstrikers:

" * * * he admitted his presence at the tavern where the fight occurred and his presence in the group of strikers who drove to the home of the assaulted employee later that night. The Commission has concluded that the claimant embarked on a course of action, in concert with his fellow strikers, to threaten and intimidate an employee of the plant who had declined to join

When the strike was called off on January 20, 1966 these four men sought to return to work and were notified to appear at the personnel office on January 21. Each was invited by the Personnel Director to give his version of the incident of November 26, and each refused to do so unless permitted to have a witness present. They were not permitted to have a witness or representative present for this investigatory fact-finding interview and thus refused to talk about the incident.[3] Respondent's Operations Manager testified:

"[W]e have never made a practice to discuss a disciplinary problem with other employees. If an individual has

a personal problem that he thinks maybe his foreman is discriminating against him or if he has a problem that he doesn't want to discuss with his foreman or the superintendent, he can certainly get permission to come out and talk with me and they can have a witness.

"But as far as when you are talking about disciplinary problems, we have never allowed it."

General Counsel points to one instance where Respondent on September 10, 1965 did allow an employee to have a witness present during a disciplinary investigation. The employee was Norman Huffman who had slapped a fellow em-

---

the union in its efforts to shut down the employer's plant. Such actions do constitute misconduct connected with the work in that they tend to prevent an employee from exercising independent judgment as to whether he will continue his employment with the employer or join his fellow workers in their attempts to bring bargaining pressure upon the employer. In view of this finding the Commission has determined that the claimant must be disqualified under Section 5(b) of the Act [Vernon's Ann.Civ.Tex.St. art. 5221b-3(b)]. The decision of the Appeal Tribunal will accordingly be reversed and the claimant will be disqualified 12 weeks under the above section of the Act."

3. Article VIII of the Policy Statement of Respondent deals at some length with "Problem Solving" and reads as follows:

"Section 8.01. Everyone, as least occasionally, has a problem. There may be times when you feel your foreman has reached a wrong decision which is unfair to you. Or it may be that you have not received something that you believe you are entitled to under your benefit program, such as the right amount of call-in pay or holiday pay. No matter what the problem, your foreman and supervisors are interested in working with you to find the proper solution. Please feel free to discuss the matter with any member of management. You will not be penalized in any way for bringing your problems to management members of the team.

"Section 8.02. A problem left unsolved tends to grow. Therefore, the Company has set up the following procedure for you:

"(1) Talk to your foreman. Usually he will have greater knowledge about the matter than any other member of management. Discuss it fully and freely with him.

"(2) If you and your foreman are unable to find a solution which is satisfactory to you, then bring the matter to the attention of the General Superintendent.

"(3) If the General Superintendent is unable to solve the problem to your satisfaction, he will make arrangements for you to talk with the Personnel Manager. The Personnel Manager's duty is to help you in every way possible. He will discuss the matter with you and make a complete investigation of the facts. If he is unable to bring about a solution to the problem which is satisfactory to you, he will make arrangements for a meeting at which you may present the matter to the Operations Manager.

"Section 8.03. If for some reason you prefer not to discuss your problem with your foreman, he will make arrangements for you to leave your work area so that you may present your problem immediately to the Personnel Manager or Operations Manager. Should you so desire, you may have another employee present while you are discussing your problem with any of the management representatives.

"Problems are almost certain to arise from time to time and it is the sincere desire of the Company to work with you in finding fair and just solutions. Only through working together can we have a happy team on which everyone will be proud to be a member."

ployee Jerry Marshburn while on duty. The Personnel Manager, when questioned as to why Huffman was allowed a witness and these four men not allowed one, said that the matter never crossed his mind.

As previously indicated, Green was permitted to return to work on January 27, 1966 (Respondent not then knowing that he had remained a member of the group driving out to Clark's home), and on January 24, Felts and Colley received identical telegrams as follows:

"As a result of our investigation of the incident which took place on November 26, 1965, and after full consideration of all of the facts and circumstances, we have determined that you should be discharged. Effective immediately, your employment with Trailmobile is terminated—

"C. H. Bellatti Personnel Mgr. Trailmobile"

Gray testified that he received a telegram of discharge also. We do not find it in the record but presumably it was the same as the one above quoted. As the telegrams show, these discharges were based upon "all of the facts and circumstances" of this "incident" and the testimony of the Personnel Manager shows that he considered, inter alia, the striking and assaulting of a supervisor (Higginbotham was a foreman in the same department in which Felts worked), trying to prevent Clark from pursuing gainful employment, Gray's hitting Clark right between the eyes, his observations of the physical damage done to Clark, Colley's kicking Clark in the side when he was down, and the pursuing of Clark to his home. In this connection, Mr. Bellatti, the Personnel Manager, testified, inter alia, specifically as follows:

"Let me rephrase the question this way: Did you recommend that Harold Colley be discharged?

"A. Yes, I did.

"Q. What was your basis or what were the bases for your recommendation?

"A. He participated in this activity at the Horse Shoe Lounge by inflicting—he kicked 'Rooster' Clark, kicked him in the side when he was down.

"Q. And this is the only reason that you recommended that he be discharged?

"A. That's what Mr. Clark said and for his—

"Q. Did you endeavor to pursue—

"Trial Examiner:

"Wait a minute. Let the witness finish his answer.

"Mr. Hanna:

"I am sorry, I thought he was through.

"Trial Examiner:

"And for what?

"The witness:

"And for his pursuing Mr. Clark to his home. He was a participant in that."

On this record the Board, although expressly exonerating Respondent of the "omnipresent [anti] Union animus" ascribed to it by the General Counsel, found that the postponed reinstatement of Green and the firing of Felts, Colley, and Gray were violative of both sections 8(a)(1) and 8(a)(3) of the Act. With respect to section 8(a)(1) it recognizes that N.L.R.B. v. Burnup & Sims, 379 U. S. 21, 85 S.Ct. 171, 13 L.Ed.2d 1 (1964), is applicable and, finding as a fact that these employees were not guilty of any of the misconduct with which they were charged, holds the postponed reinstatement and discharges illegal regardless of whether or not there was any anti-Union motive or purpose to discriminate. The Board notes its belief that N.L.R.B. v. Plastic Applicators, Inc., 369 F.2d 495 (5 Cir. 1966) is inapplicable presumably because it concludes that Respondent did not honestly believe these four employees were guilty of the misconduct

charged.[4] And going further the Board finds, as is required in order to constitute a violation of section 8(a) (3), N. L.R.B. v. Brown, 380 U.S. 278, 286, 85 S.Ct. 980, 13 L.Ed.2d 839, 847 (1965), that this postponed reinstatement and these discharges were actually motivated by an unlawful intent and the Respondent having no justification for the postponed reinstatement and discharges used the incident "as a pretext" to get rid of the men.

Now it is the duty of this court to adjudicate whether the above findings of the Board are "supported by substantial evidence on the record considered as a whole." 29 U.S.C.A. § 160(e). We must not refuse enforcement merely because, had we been the Board, we would have found differently, but we are not barred from refusing enforcement if we cannot conscientiously find that the evidence supporting the Board's decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view. Universal Camera Corp. v. National L. R. Bd., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); N.L.R.B. v. Pittsburgh S. S. Co., 340 U. S. 498, 71 S.Ct. 453, 95 L.Ed. 479 (1951), N.L.R.B. v. Walton Mfg. Co., 369 U.S. 404, 405, 82 S.Ct. 853, 7 L.Ed. 2d 829, 831 (1962). A careful study of the record in the light of these legal principles impels us to the conclusion that the implication that Respondent did not honestly believe these men guilty of the misconduct charged, the findings

that they were not guilty, that the postponed reinstatement and discharges were illegally motivated and that the incident was a pretext to get rid of the men are not supported by substantial evidence.

The question is much broader than who started the fight.[5] That question need not be answered. We cannot assume that Higginbotham started it just because he passed the first blow. We might as well, or more appropriately, assume that Felts started it by the language he used of and to Foreman Higginbotham and by his refusal to withdraw that language when given an opportunity to do so and by standing up and repeating it.[6] But if we assume that Felts was not the aggressor inside the Lounge it would be difficult to assume that he did not become the aggressor after he left the Lounge and proceeded to overpower Clark, assault Cox, and resist the peaceful importuning of Green in order "to go after Higginbotham or follow after Higginbotham". This aggressiveness reminds us that he had been fired from his previous employment for fighting. But if we assume that even on the parking lot Felts was not the aggressor and up to leaving the parking lot was guilty of no misconduct, there remains the late-at-night trip to the point on the highway in the adjacent County immediately in front of Clark's home for which all justification is absent.

Colley and Gray were guilty of no misconduct inside the Lounge (but

---

4. Plastic Applicators, Inc. holds that once such honest belief appears the burden is on the General Counsel to go forward with evidence that the employees are not guilty.

5. "Who was to blame in the altercation is, likewise, beside the point, as the employer had the right to discharge Timmerman because of the altercation whether he was to blame or not, so long as this was the real ground of the discharge and not a mere pretext." N. L. R. B. v. Clearwater Finishing Company, 216 F.2d 608 (4 Cir. 1954).

6. Employees have been lawfully fired for using such language of and to super-

visors. In National Labor Relations Board v. Union Mfg. Co., 124 F.2d 332, 333 (5 Cir. 1941) an employee said: "G— d— it" several times in conversation with foreman. In National Labor Rel. Bd. v. Miami Coca-Cola Bottling Co., 222 F.2d 341, 343 (5 Cir. 1955) a receptionist used vulgar and profane language. In National Labor Relations Board v. Blue Bell Inc., 219 F.2d 796 (4) (5 Cir. 1955) a female employee wrote a letter to employer's vice-president calling him a "liar". In Farmers Co-Operative Co. v. National Labor Rel. Bd., 208 F.2d 296 (8 Cir. 1953) an employee said to the manager "G— d— it, you s— of b—," etc.

neither was Clark) and their own explanation of why they beat him up as soon as they could get to him outside the Lounge is too thin and transparent to merit discussion. Clark had joined the Union, gone out on strike and then repudiated both. If we can believe Clark, Green stood by while Colley and Gray were beating him and when appealed to for help, said: "You had a chance to change sides of the fence." [7] Here again if we were to assume that Colley, Gray and Green were guilty of no misconduct on the parking lot, they rode with Felts to Clark's home and, as the Texas Employment Commission specifically found with respect to Gray, "embarked on a course of action, in concert with * * * fellow strikers, to threaten and intimidate an employee of the plant who had declined to join the union in its efforts to shut down the employer's plant." The Board did not make a finding as to whether or not Felts in front of Clark's home made the specific threat ascribed to him by Clark and not denied by Felts. Such a finding as we see it was not necessary because the intent to intimidate is obvious with or without the specific threatening remark. See Oneita Knitting Mills, Inc. v. N.L.R.B., 375 F.2d 385, 391 (4 Cir. 1967). The Board has denounced visits by strikers to non-strikers' homes where the conditions were far less ominous. Kohler Co., 128 N.L.R.B. 1062, 1106–1107 (1960). The fact that these night riders left from in front of Clark's home when they did and without actual violence being repeated out there is probably due to the arrival of another car which happened to be occupied by Higginbotham and his wife who were coming to Clark's home to see whether he had been able to drive himself home.

The record considered as a whole showing clearly not only that Respondent honestly believed, but also that it is true, that these four employees were guilty of the misconduct charged section 8(a) (1) was not violated, the Board's finding to the contrary being not supported by substantial evidence.

Nor was section 8(a) (3) violated. The unlawful intent here required is not lightly to be inferred but must be proven with respect to each discharge. N.L.R.B. v. Dan River Mills, Incorporated, 274 F.2d 381, 384 (5 Cir. 1960); National Labor Relations Board v. McGahey, 233 F.2d 406 (5 Cir. 1956); National Labor Relations Board v. Russell Mfg. Co., 191 F.2d 358(4) (5 Cir. 1951); National Labor Relations Board v. C. & J. Camp, Inc., 216 F.2d 113, 115 (5 Cir. 1954). As this court said recently "the evidence of legitimate motive by the employer is sufficiently compelling that implications of illegality cannot control this [firing] * * *." N.L.R.B. v. Laney & Duke Storage Warehouse Co., 369 F.2d 859, 868 (5 Cir. 1966).

The Board's findings above described are not validated by its subsidiary findings (1) that another striker Fife was not discharged for fighting and (2) that Respondent made only a cursory investigation as to these four employees in that it refused their re-

7. Gray denies hitting Clark saying "I did have the back of my hand against 'Rooster' pushing him back and about this time Colley hit him." Whether or not Gray or Green actually threw a blow is not at all determinative. All who "gang up" or participate with others in assaulting and illegally intimidating a non-striking employee to prevent him from pursuing lawful gainful employment become particeps criminis and aiders and abettors and "forfeit(ed) any right they may. have had to reinstatement as employees." National Labor Rel. Bd. v. Longview Furniture Co., 206 F.2d 274, 277 (4 Cir. 1953); Rubin Bros. Footwear v. National Labor Relations Board, 203 F.2d 486, 488 (5 Cir. 1953); Oneita Knitting Mills, Inc. v. N. L. R. B., 375 F.2d 385, 391 (4 Cir. 1967); W. T. Rawleigh Co. v. National Labor Relations Board, 190 F.2d 832, 839 (7 Cir. 1951). The Board concurs. "An assault is enough to instill fear of present physical harm without a battery. The Board has found that conduct calculated to put a non striker in fear of bodily harm is sufficient to justify the employer in denying the status of employee to the misbehaving striker." Titan Metal Manufacturing Co., 135 N.L.R.B. 196, 206 (1962).

quest to have a witness present during the Personnel Director's preliminary investigation of their conduct. The Fife fight was thoroughly investigated and found to have nothing to do with company and union differences. It was not work related. The fact that the company on one occasion relaxed its standard policy not to permit witnesses at investigatory fact-finding interviews would not require it to abandon that firmly fixed policy. These investigatees had no contractual right, nor any right under the Act, to have such representation. See Chevron Oil Company, 168 N.L.R.B. No. 84, 1968–1 C.C.H. N.L.R.B. 28,834, Par. 21,952.

The petition to review and set aside the order is Denied in Part and Granted in Part; the petition to enforce is Denied in Part and Granted in Part. The order will be *enforced* except insofar as it relates to Colley, Felts, Gray and Green; insofar as it relates to said four persons it is hereby *set aside*.

BELL, Circuit Judge (concurring in part and dissenting in part):

I respectfully dissent from that part of the majority decision which refuses to enforce the board's order as to the discharge of Felts, Gray, and Colley and the postponed reinstatement of Green. The majority has accorded respondent a de novo proceeding on the record made before the trial examiner. This approach differs from the traditional de novo proceeding only in the respect that the court took no further testimony. It may be said, in fact, that in the annals of this court there can be found no more classic example of a de novo proceeding in a labor case.

The role of the court is clear. The Act provides that the findings of the board with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive. 29 U.S.C.A. § 160(e), (f). This is the rule of Universal Camera Corp. v. NLRB, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

It is settled also that the resolution of conflicting testimony concerning the discharge of employees and the drawing of inferences from facts established on the hearing before the trial examiner falls within the province of the board. This court is not to pass on the credibility of the witnesses nor are we to reweigh the evidence. NLRB v. Universal Packing & Gasket Company, 5 Cir., 1957, 379 F.2d 269, 270; NLRB v. Longhorn Transfer Service, Inc., 5 Cir., 1965, 346 F.2d 1003, 1005; NLRB v. Transport Clearings, Inc., 5 Cir., 1962, 311 F.2d 519, 523. In the *Longhorn Transfer* case the court said: "* * * We, however, are not the fact-finder whose function it is to accept or reject, credit or discredit, conflicting versions of factual events and the inferences to be drawn from them * * *." 346 F.2d at p. 1005. Moreover, "* * * we are not free to deny enforcement [of the board order] simply because the evidence may also reasonably support other inferences or because we might well have reached a different result had the matter come before us de novo." NLRB v. Universal Packing & Gasket Company, supra, 379 F.2d at p. 270; NLRB v. O. A. Fuller Super Markets, Inc., 5 Cir., 1967, 374 F.2d 197, 200; NLRB v. Camco, Inc., 5 Cir., 1966, 369 F.2d 125, 127; Oil City Brass Works v. NLRB, 1966, 5 Cir., 357 F.2d 466, 469. This is the teaching of Universal Camera Corp. v. NLRB, supra, 340 U.S. at p. 488, 71 S.Ct. 456.

We must examine the facts as found by the trial examiner and adopted by the board in the frame of reference of these authorities. In doing so, it becomes quite clear that the majority has erred. There were seven participants in the altercation at the Horse Shoe Lounge. Green, Gray, Felts, and Colley were officials of the union on strike. Higginbotham, Clark, and Cox were non-union employees who were continuing to work during the strike. The entire group had been engaged in drinking beer for sometime prior to the fight, although in separate convocations. The trial examiner heard the testimony of each of the seven. He expressly credited the testimony of Green, Felts, and Colley and rejected

the testimony of Higginbotham and Clark with respect to the series of events which began in the Horse Shoe Lounge. This leaves the testimony of Gray and Cox and their testimony adds nothing substantive either way.

Only Higginbotham, a non-union man, fought inside the lounge. He struck Felts and knocked out some of his teeth. Some might have the view that Felts provoked the fight by the use of language directed at Higginbotham and his colleagues which was calculated to insult them. Others may be of a different view. The trial examiner was. He found and the board agreed that Higginbotham started the fight. In any event, only one blow was passed inside the lounge and the fighting resumed on the outside. The fight was brought under control by the group without outside interference.

One of the union officials was restraining Felts after the group got outside the lounge but Higginbotham, by his own testimony, requested that Felts be turned loose so that he could fight him. Higginbotham then lost the fight and left. Clark was mixed into the group and his claim was that Gray and Colley administered a beating to him. The examiner discredited Clark. The testimony of Colley, which was credited, was that he and Gray were attempting to persuade Clark to leave so that they would not all get into trouble when Clark started kicking them. He then hit Clark one time and Colley and Gray assisted Clark to his car. Colley testified that Gray did not hit Clark. Cox testified that he was not hit at all. The net was a fight between Higginbotham and Felts and some damage to Clark. Neither Higginbotham nor Clark missed work or received medical treatment. Clark's upper denture was cracked.

A short time after the fight, as the majority states, the four union officials drove some five miles into the country just beyond the home of Clark for the purpose, as they contended, of relieving themselves along side the road. Clark testified that his dog gave an alarm and that he backed his car into a driveway so as to shine the lights of the car on the group. This is undisputed. The testimony of Green bolsters this testimony. Clark testified that the four union men then drove away and that Felts shouted an obscenity to him relative to his non-union status and that the fact that they would return the next night. The proof of Felt's remark came only from Clark. Clark was not credited as a witness. Felts had no recollection of what happened on the road because he was drunk. Green, Gray, and Colley all testified, in effect, that Felts made no such statement.

The majority opinion, in essence and inexplicably, restores credibility status to Clark and rejects the testimony of the other three witnesses. It is, of course, possible that these union officials went into Clark's neighborhood as a part of a terroristic or night rider tactic but the record simply will not sustain a holding, absent a de novo review, that a contrary finding was incorrect.

We come then to the question of the discharges and yet another reason why the majority decision is incorrect. The strike started in September, 1965. The Horse Shoe Lounge altercation took place on November 26, 1965. The strike was terminated on January 19, 1966. Most of the workers returned to work immediately. Felts, Colley, Gray, and Green were instructed to report to the personnel office on January 21, 1966. Upon reporting, personnel director Bellatti attempted to question them concerning the Horse Shoe Lounge incident. They were called in separately. Each declined to discuss the subject without having an employee witness present. Their requests in this regard were refused. Bellatti made it clear that he had statements concerning the incident from the non-union men, Higginbotham, Clark and Cox. The refusal to permit the dischargees to have a witness present was unusual in that this accommodation had been afforded another employee involved in an altercation at about the same time and a fair reading of the company policy statement indi-

cates that such was contemplated. Footnote 3, majority opinion, § 8.03.

Green was reinstated on January 27, Felts, Gray, and Colley were notified by telegram on January 24 of their discharges. Bellatti testified that he discharged Gray because he struck Clark, and because he was involved with the other participants (Felts, Colley, and Green) in assaulting a supervisor, i. e., foreman Higginbotham, and for trying to prevent Clark from pursuing gainful employment. Bellatti testified that Colley was discharged for participating in the Horse Shoe Lounge activity and for kicking Clark in the side when he was down and for pursuing Clark to his home. He testified that Felts was discharged for assaulting foreman Higginbotham.

Bellatti stated that the discharged group refused to tell him anything. His memory was hazy about what Clark told him although he had obtained statements from Clark, Higginbotham, and Cox. At this point general counsel sought the statements which Bellatti had obtained from Clark, Higginbotham, and Cox. Counsel for respondent stated that he had the statements but refused to make them available because they were part of his trial file. Clark, Higginbotham, and Cox all testified that they had given statements to Bellatti but they had lost or destroyed their copies.

Bellatti testified that he did not know that Green had gone with the others to Clark's home and that he did not learn of it until a hearing involving unemployment compensation for Gray which was held by a state board the following March. He had earlier testified that Green was not discharged because he did not participate in the Horse Shoe Lounge incident. Bellatti gave no testimony whatever that he knew of the trip to Clark's home at the time of the discharges, nor was there other proof to demonstrate this fact.

It appears that the company made no effort to show that it had any knowledge of the trip to Clark's home at the time of these discharges. It had the statements of Higginbotham, Cox, and Clark but these statements were not made available at the hearing. These three employees did not testify that they told Bellatti of the trip to Clark's home. The company did not obtain the version of the four union officials; rather it chose to impose a condition upon them of not having a witness available when they gave their version and it is undisputed that this departed from the current policy and the past practice of management. These circumstances must be measured against the indisputable fact that there is not one shred of evidence that respondent knew, contemporaneous with the discharges, of the incident involving the trip to Clark's home. The fact that respondent did not know is buttressed by Bellatti's testimony that he did not learn in his investigation of the Horse Shoe Lounge fight that Green had gone to Clark's home. There is a total absence of proof that he learned in his investigation of any of the four going there. Indeed, Bellatti did not purport, even at the hearing, to claim that anyone other than Colley was discharged because of the Clark home incident.

The board adopted the findings and conclusions of the trial examiner. One conclusion was that the fight was started by Higginbotham. As stated, the discharged union employees were credited in their version of the altercation and the testimony of Higginbotham and Clark was rejected. The examiner also drew an inference from the failure of respondent to produce the statements of Higginbotham, Clark, and Cox that the statements would contradict respondent's contentions concerning responsibility for the incident in question and its reasons for discharging the employees. This was a fair inference and went to the heart of the responsibility for the fight and whether respondent knew at the time of the discharges of the trip to the vicinity of Clark's home. See Interstate Circuit v. United States, 1939, 306 U.S. 208, 226, 59 S.Ct. 467, 83 L.Ed. 610; United States v. Johnson, 5

Cir., 1961, 288 F.2d 40, 45; 2 Wigmore, Evidence, 3rd ed., § 285. The examiner drew on another fact to support his conclusion: that the participants in another fight at another lounge at about the same time were not disciplined although the fight was between a striker and a non-striker and was triggered by the same type of epithet. Coupling this with the failure to hear from the prospective dischargees unless they waived having a witness present, the examiner concluded that respondent had no justification for discharging the men but merely used the altercation as a pretext for getting rid of three union officials.

This conclusion and the factual findings on which it rests are amply supported on the whole record before the court if the court gives way to credibility findings. It follows, I regret to say, that the majority has committed an egregious error in failing to enforce the board's order.[1]

---

1. The 1968 annual report of the Director of the Administrative Office of the United States Courts shows a sharp rise in labor board enforcement proceedings in the Fifth Circuit. The number of such cases in this circuit varied from a low of 60 to a high of 65 between the years 1963–67. The number increased in 1968 to 121. A de novo proceeding such as the majority has here invoked will be a powerful stimulus to the trend. The NLRB cases in the Fifth Circuit in 1968 constituted 8.8 per cent of the entire docket and this is to be compared with 6.4 per cent for the year 1967.